**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Ibraheem Samirah

vs.                                          Plaintiff

Maryam Seifi                                 Case Number     **2020 CA 002808 B**

                                             Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Leizer Z. Goldsmith

Name of Plaintiff's Attorney                                  *Clerk of the Court*

5335 Wisconsin Avenue, N.W., Suite 440        By _____

Address                                                          Deputy Clerk
Washington, D.C. 20015

(202) 926- 3535                               Date     **06/17/2020**

Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오       various script (202) 879-4828      Amharic text (202) 879-4828

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                      Super. Ct. Civ. R. 4

**IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA**

IBRAHEEM SAMIRAH, DDS
12502 Dardanelle Court
Herndon, VA 20170,

Plaintiff,

v.

DISTRICT SMILES, PLLC
4000 Albemarle Street, NW, #203
Washington, D.C. 20016

And

**2020 CA 002808 B**

DR. MARYAM SEIFI
9216 Quintana Drive
Bethesda, MD 20817

And

WILLIAM POWELL
9216 Quintana Drive
Bethesda, MD 20817

And

NINA KIMMEL
9216 Quintana Drive
Bethesda, MD 20817,

Defendants.

## COMPLAINT

### (Discriminatory Pay, Breach of Contract, Unpaid Wages, Retaliation)

COMES NOW the Plaintiff, Ibraheem Samirah, and, in support of his

cause of action, states as follows:

### I.      NATURE OF ACTION

1.     This is a suit by Dr. Ibraheem Samirah ("Dr. Samirah" or

"Plaintiff"), a former employee of District Smiles, PLLC d/b/a/ "District

Smiles," alleging unlawful and discriminatory denial of pay and retaliatory

discharge, under various statutes and common law theories.

### II. JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction over this Complaint

because this action arises under the District of Columbia Code 1981, § 11-921,

and the District of Columbia Human Rights Act, District of Columbia Code, § 2-

1401.01 et seq.

Venue properly lies in this Court because the events occurred in the District of

Columbia, and the controversy involves Defendants' behavior in the District of

Columbia.

### III.   PARTIES

3.     Plaintiff Ibraheem Samirah is a dentist and practicing Muslim. He

is Palestinian of biracial Afro-Arab lineage and identifies as Palestinian, Arab,

and Black.

2

4.     Dr. Samirah was previously employed by Dr. Maryam Seifi and her limited liability companies, Maryam Seifi, DDS PA d/b/a StarBrite Dental and District Smiles.

5.     Defendant Maryam Seifi is a dentist the sole owner of both StarBrite and Defendant District Smiles. Defendant Seifi is a native speaker of Farsi who was born and raised Muslim in Iran until adulthood and is now a follower of Scientology. Dr. Seifi was an "employer" to Dr. Samirah within the meaning of D.C. Code 2-1401.02(10).

6.     Defendant Nina Kimmel is Defendant Seifi's daughter and is the Chief Operating Officer and Chief Financial Officer of both StarBrite and Defendant District Smiles, who also follows Scientology. Ms. Kimmel was an "employer" to Dr. Samirah within the meaning of D.C. Code 2-1401.02(10). , and.

7.     Defendant William Powell, Defendant Seifi's husband and Defendant Kimmel's stepfather, is Black and non-Muslim.  He is the Office Manager of District Smiles. Mr. Powell was an "employer" to Dr. Samirah within the meaning of D.C. Code 2-1401.02(10).

IV.     **EXHAUSTION OF ADMINSTRATIVE REMEDIES**

8.     No particular administrative remedies need be exhausted under any of the statutes and doctrines pled herein.

9.     This Complaint is also timely under all applicable statutes of limitation, since the hostile environment and unlawfully denied pay inflicted

against Dr. Samirah culminated in his termination on June 17, 2019, and this action is filed less than 365 days thereafter.

## V.     STATEMENT OF FACTS

### Dr. Samirah is Employed at StarBrite

10.     Beginning in July 2018, Dr. Samirah worked for Defendant Seifi's Maryland company, Maryam Seifi, DDS PA d/b/a StarBrite Dental ("StarBrite"), as a dentist.

11.     Initially, Dr. Seifi hired Dr. Samirah for a trial period in July 2018.

12.     Upon determining that Dr. Samirah was well-qualified, Dr. Seifi offered him a full-time position at StarBrite at the beginning of August 2018.

13.     Defendant Nina Kimmel, Dr. Seifi's daughter and StarBrite's administrator, offered Dr. Samirah what she represented as a better employment opportunity working at Dr. Seifi's District of Columbia practice, Defendant District Smiles, PLLC ("District Smiles").

Dr. Samirah's transfer to District Smiles was contingent upon being "properly trained" at StarBrite.

### The Discriminatory Atmosphere at StarBrite

14.     Defendant Seifi is a native speaker of Farsi who was born and raised in a Muslim family in Iran until adulthood.

15.     In various conversations, Dr. Seifi revealed to Dr. Samirah that she follows Scientology.

4

16. Defendant Seifi has exhibited hostile views against religious Muslims such as Dr. Samirah.

17. Thus, beginning in his first two weeks of work at StarBrite, Kimmel and Seifi, both Iranian American, repeatedly mispronounced Dr. Samirah's first name, Ibraheem, to insult Dr. Samirah.

18. The name "Ibraheem," often spelled "Ibrahim," is a very common name in the Middle East region, including in Iran.

19. The name emanates from the Qur'an.

20. Nevertheless, Defendant Seifi disparagingly mispronounced Dr. Samirah's first name for the following eleven months, insisting on calling him by the Anglicized "Abraham" to negate his identity, including in the presence of her subordinates, and even after Dr. Samirah corrected Defendant Seifi repeatedly.

21. During Dr. Samirah's first week of work at StarBrite, Defendant Kimmel asked about the origin of Dr. Samirah's name.

22. Dr. Samirah explained to Kimmel that Dr. Samirah is Palestinian and that his first name is the Arabic version of Abraham.

23. Defendant Kimmel replied that she is Iranian and Muslim like her mother, Defendant Seifi, and that she celebrates Eid.

24. Defendant Kimmel then queried whether Dr. Samirah drank alcohol, referencing that practicing Muslims often abstain.

25. Dr. Samirah responded to Defendant Kimmel that he does not consume alcohol.

5

26.     Defendant Kimmel replied, "We get together in the office and drink sometimes. That's why I was asking."

27.     At one point, Defendant Kimmel said her family was "technically Muslim."

28.     Defendant Seifi said this once as well.

29.     In or around July 2018, Defendant Kimmel asked Dr. Samirah if she could call him "Abe" as a nickname.

30.     He informed her that this would be a nickname for the name "Abraham," which was not his name.

31.     Dr. Samirah said that she could call him "Ib" for short, but she preferred to call him "Dr. Abraham" instead.

32.     Despite explaining to Defendant Kimmel what she already knew, that Dr. Samirah's name is pronounced exactly as it is spelled, Defendant Kimmel rudely insisted on negating Dr. Samirah's identity, calling him "Dr. Abraham" for the next eleven months.

33.     Dr. Samirah corrected Defendant Seifi's and Defendant Kimmel's mispronunciations approximately 15 times in total within the first two weeks of work.

34.     Other office personnel began to mispronounce Dr. Samirah's first name in the same way that Defendant Kimmel and Defendant Seifi distorted it.

35.     Dr. Samirah interacted with these office personnel, too, through October 2018.

6

36.     In or around July 2018, Dr. Samirah was wearing a significantly long beard, which reflected his Muslim identity.

37.     Celine Figueroa, the StarBrite office manager, declared to Dr. Samirah, "People might think that you're a terrorist," apparently referencing his appearance.

38.     Dr. Samirah explained to Figueroa that this can be a very damaging thing to say, as it is a narrative that has caused global harm.

39.     Figueroa defended herself by saying that she was from the south of Paris and that she grew up with "those" people.

40.     She further explained that the south of Paris is a predominantly North African, Arab, and Muslim area.

41.     Dr. Samirah persisted in explaining why Figueroa's statement was unwelcome. He made himself available to elucidate this matter further.

42.     In or around July 2018, at StarBrite, Defendant Seifi, who practices the religion of Scientology, asked Dr. Samirah to read her Scientology books located in the office.

43.     Defendant Seifi implored that reading these would "really help to inform" Dr. Samirah's income-earning strategy.

44.     Defendant Seifi incorporated the Scientologist theology regarding money-making into her business model and wanted Dr. Samirah to follow suit with her Scientology-based practices in her District Smiles office.

7

45.     Defendant Seifi assigned two Scientology books for Dr. Samirah to read during his work hours at StarBrite, and he complied by reading them.

46.     Defendant Seifi installed a photograph of Scientology founder L. Ron Hubbard in the StarBrite back offices.

47.     Defendant Seifi also reminded Dr. Samirah that she is of Muslim background. He noticed that she never felt the need to point this out to anyone else.

48.     Omer Akmal, the practice periodontist, is Pakistani American and had been at StarBrite longer than Dr. Samirah.

49.     Between July and October 2018, Akmal daily used the n-word in the office backroom to describe Black and South Asian patients and people. He never used it in reference to white people or any other race or ethnicity.

50.     During these four months, Drs. Samirah and Akmal had a number of different conversations.

51.     In nearly every one of their conversations, Akmal said the n-word at least five to ten times and was very vulgar generally.

52.     Thus, Dr. Samirah, an Afro-Arab, was subjected to this racial slur perhaps 50-100 times.

53.     In or around August 2018, while Dr. Samirah was in the backroom, Dr. Akmal was making weekend plans with Ali Eghtesadi, the practice endodontist.

8

54.     Dr. Akmal relished in the fact that he goes out to bars and clubs on the weekends and that he consumes copious amounts of alcohol.

55.     Dr. Akmal further stated that he is "going to hell" for his alcohol consumption.

56.     Dr. Akmal was aware that Dr. Samirah is a practicing Muslim who does not consume alcohol.

57.     Dr. Akmal's statements otherized Dr. Samirah, who was known at the practice for being the only person who abstained from alcohol.

58.     In or around September 2018, Dr. Samirah confronted Dr. Akmal about his use of the n-word.

59.     Dr. Samirah told Dr. Akmal to stop using the word.

60.     Dr. Samirah explained that it was offensive and that Dr. Akmal had no license, as a Pakistani American, to use it.

61.     Dr. Samirah further described that, as someone of Afro-Arab lineage, he took personal offense to Dr. Akmal's use of the n-word.

62.     Dr. Akmal recounted what it was like to grow up in South Dakota as the only family of color in his town.

63.     Dr. Akmal jeered, "I was the n**** growing up, so I am a n*****."

64.     Dr. Akmal also ridiculed his own parents for their steadfast practice of Islam and said laughingly that his parents were "terrorists."

65.     Dr. Akmal referred to his parents as "super religious" with "terrorist tendencies."

9

66.     Dr. Akmal further said offensively, "I used to be a sheikh, but ever since I left South Dakota, I don't believe in Islam. I don't like religion."

### Dr. Samirah Protests Dr. Akmal's use of the N-Word to Kimmel

67.     Shortly after Dr. Samirah confronted Dr. Akmal in or around September 2018, Dr. Samirah raised the matter with Defendant Kimmel, and Kimmel admitted knowledge of what Dr. Akmal was saying, responding: "I know, I know."

68.     Dr. Samirah never heard back from Kimmel that anything was done to stop Dr. Akmal's use of the n-word.

### Dr. Samirah Accepts Employment at District Smiles

69.     After four months at StarBrite, Dr. Seifi determined that Dr. Samirah was well-qualified in his dental proficiency to practice as Lead Dentist in her District Smiles location.

70.     Dr. Seifi offered the position to Dr. Samirah, noting that he would be the only dentist at her D.C. practice and, as such, he would not need to share the office's daily income percentage with anyone.

71.     Defendants Kimmel and Seifi told him that he would earn more there than at StarBrite.

72.     Toward the end of October 2018, Dr. Samirah transitioned to the District Smiles practice. He worked there from October 2018 through his unlawful termination in June 2019.

10

73.     Defendant Seifi had opened District Smiles at American University Park more than a year prior and told Dr. Samirah that the practice would flourish once he got there.

74.     Defendants Kimmel and Powell claimed that the previous District Smiles Lead Dentist, Dr. LaShaunda Seaberry — who is Black — was lazy, and that her indolence caused the District Smiles practice to remain dormant for most of her year there.

**Defendants Malign Dr. Samirah Over his Appearance**

On numerous occasions, Defendants criticized the appearance of Dr. Samirah's physique while wearing his scrubs.

Female dental staff were not subjected to the same indignities.

**Dr. Samirah's District Smiles Employment Contract**

75.     Defendant Kimmel provided Dr. Samirah with an employment contract proposal for Dr. Samirah's move from StarBrite to District Smiles.

76.     After negotiation, the contract was executed. Ex. 1.

77.     Dr. Samirah's District Smiles contract stipulates that "District Smiles shall offer Dr. Samirah no less than forty-eight (48) hours of clinical working hours each week." See Ex. 1 hereto.

78.     Notwithstanding, in not one of his thirty-four weeks of employment with District Smiles was Dr. Samirah ever provided with the mandatory 48 clinical working hours.

79.     Dr. Samirah's contract further stipulates that he "shall be compensated at a rate of thirty percent (30%) of the net collections of District

11

Smiles less fifty percent (50%) of the laboratory fees associated with District

Smiles patients. For purposes of this section, net collections shall mean the total

net collections after any merchant fees, discounts and refunds."

80.    Dr. Samirah requested a per diem guarantee when negotiating the

District Smiles contract, but Defendants would not agree.

81.    Dr. Samirah negotiated for the 48 clinical hours guarantee,

believing that would afford him the requisite compensation.

**Dr. Seifi's Christmas Party**

82.    In December 2018, Dr. Seifi hosted a Christmas party, to which she

invited Dr. Samirah.

83.    Dr. Seifi gave Dr. Samirah a gift that said, "Merry Christmas and

Happy New Year." Dr. Seifi knew that Dr. Samirah was not a Christian.

84.    Dr. Seifi had not wished Dr. Samirah a Happy Eid al-Adha or Eid

al-Fitr, nor did she host an Eid celebration for the practice.

**Seifi and Kimmel Denigrate Dr. Samirah About not Drinking Alcohol or Eating Pork**

85.    On at least three different occasions in 2019, Defendants Seifi and

Kimmel raised with Dr. Samirah and teased him about not drinking alcohol or

eating pork.

86.    On various other occasions, Defendant Kimmel would look at Dr.

Samirah and say: "Go grab a beer," though she knew he would not do so.

12

87.     In March 2019, District Smiles and StarBrite Dental, both owned by

Maryam Seifi, conducted a joint marketing meeting.

88.     Dr. Seifi's two companies shared a marketing expert, Kimmel's

husband.

89.     William Powell, Dr. Seifi's husband, and Eliana Figueredo, a dental

assistant, worked at both locations.

**Defendants Require Daily Unpaid Labor From Dr. Samirah as a
Condition of Continuing his Employment and Generate False
Documentation Relevant to his Compensation**

90.     As noted above, Dr. Samirah's three-year contract with Defendant

District Smiles only provided for compensation based on the per-patient formula

and guaranteed him 48 clinical hours per week.

91.     Nonetheless, during Dr. Samirah's employment, Defendants

imposed a demand upon him that, in addition to working paid clinical hours as

set forth in his employment agreement, he provide extensive unpaid services

daily.

92.     Defendants demanded that Dr. Samirah idly staff the District

Smiles facility for hours for which Defendants had failed to fulfill their

contractual obligation to provide patients.

93.     For example, Dr. Samirah was required to remain in the "business

operations" room, uncompensated, during Defendant Powell's financial

presentations to all new patients.

13

94.     Defendant Powell ordered him to stay in the room to answer any questions from the patient, forcing Dr. Samirah to provide his dental expertise, advice, and skill for free.

95.     Defendant Powell's financial meetings with each new patient lasted approximately 30 minutes and were added into Dr. Samirah's daily schedule, among other things, to give the appearance of a falsely fuller schedule.

96.     Defendants began to create false documentation to cover up their failure to pay Dr. Samirah according to the mandatory contract provisions they had negotiated with him, by generating scheduling documents indicating that Dr. Samirah's dental procedures required much longer appointments than was accurate or customary. For instance, they would attribute 3 hours of clinical time to an appointment that only required 45 minutes' work.

97.     Testifying at the Unemployment Hearing, Defendant Powell denied that this ever occurred.

98.     Defendants awarded Dr. Samirah Panera and Whole Foods gift cards.

99.     Defendants represented that this was for excellent customer reviews. See Ex. 2 hereto.

100.    – This occurred around March 30, 2019, nearly six months into his employment with District Smiles and 9 days before Defendant Powell began secretly documenting against Dr. Samirah to fire him.

101.    Nonetheless, Defendant Powell testified at the Unemployment

Hearing that Dr. Samirah was "incompetent."

102.    Defendant Powell alleges that this incompetence was not apparent

while Dr. Samirah was working at StarBrite, but that this became apparent only

after Dr. Samirah came to District Smiles.

**On April 8, 2019, Dr. Samirah Demands Sufficient Clinical Hours**

103.    On April 8, 2019, just days after he received Defendants' gifts for

his performance, Defendant Powell attempted to coerce Dr. Samirah into

providing unnecessary dental care to a patient, so as to be able to charge the

patient more.

104.    Dr. Samirah refused, as this was unethical and despite the fact that

he would collect a percentage of the treatment at a dental practice in which he

was deficiently paid.

105.    As Defendant Powell insisted, Dr. Samirah told Defendant Powell

that Powell needed to stop trying to tell him how to practice dentistry, and

instead to focus on doing his own job, as Powell was failing to provide sufficient

patients so as to allow Dr. Samirah to complete the agreed-upon clinical hours

for which Dr. Samirah was supposed to be paid.

106.    At the Unemployment Hearing, Defendant Powell admitted that

Dr. Samirah complained that he wasn't making as much money as a dentist

should, but that Dr. Samirah never complained he wasn't getting paid according

to his contract.

15

107.   Dr. Samirah went so far as to assert that he would not be able to continue at District Smiles if these matters were not straightened out.

108.   Defendant Powell subsequently texted Defendant Kimmel about the encounter, distorting what happened.

109.   Dr. Samirah was informed neither of that text's creation nor its conveyance to Defendant Kimmel.

110.   Defendants Kimmel and Powell immediately agreed that Defendant Powell would commence creating written documentation against Dr. Samirah and supply it to Defendant Kimmel.

111.   For instance, on April 9, 2019, Powell wrote that Dr. Samirah arrived 25 minutes late.

112.   At the Unemployment Hearing on June 15, 2020, Powell admitted that Defendants have video showing Dr. Samirah arriving on April 9, but that he had not looked at the video to confirm his assertion.

113.   Thereafter, Defendant Powell wrote numerous "daily reports" to Defendant Kimmel, alleging various misdeeds by Dr. Samirah.

114.   The reports were never provided to Dr. Samirah.

115.   Defendants never interviewed Dr. Samirah about the allegations contained in the reports.

116.   The daily reports contained numerous falsehoods and demonstrate indicia of retaliation.

**Dr. Samirah Opposes Defendant Powell's Bigoted Statements**

16

117. On April 18, 2019, Dr. Samirah arrived at District Smiles pleased that the Mueller report pertaining to President Trump had been made public.

118. Defendant Powell disagreed with Samirah's sentiments.

119. Defendant Powell asserted that he liked President Donald Trump. He contended, "Yeah, he's racist, but Black people are always out here to get unemployment benefits. They are lazy. Everyone wants to be on welfare."

120. Dr. Samirah contested Defendant Powell's sentiments and expounded his arguments on systemic issues and other circumstances that might lead someone to be in a desperate situation.

121. Dr. Samirah again brought up his biracial identity while refuting Defendant Powell's anti-Black statements.

122. Defendant Powell rebutted that many people do not have good reasons.

123. Defendant Powell was well-aware of Dr. Samirah's Afro-Arab heritage.

124. However, he now denies any such awareness.

125. Indeed, at the Unemployment Hearing, Powell denied ever discussing welfare or unemployment with Dr. Samirah.

126. Notably, Defendants Powell and Kimmel also called Dr. LaShaunda Seaberry—Dr. Samirah's predecessor who was also Black—lazy.

### Dr. Samirah Protests Defendants' Forced "Sacrifice" of his Income and Discrimination to Defendant Kimmel

127.   After the April 8 and 18 incidents with Defendant Powell, Dr. Samirah protested to Defendant Kimmel.

128.   On May 7, 2019, Dr. Samirah emailed Defendant Kimmel.

129.   Therein he pointed out that on "multiple" occasions, he had brought problems of the "inefficient scheduling mechanism" to "the District Smiles team," Defendants Seifi and Kimmel.

130.   Dr. Samirah again objected to being required to "wait around. . . for work[,]" "sit around," and "wait[] for something to do[,]" on account of "administrative issues." He added that it was "impractical" to spend "time in the clinic simply hoping that the administration of [his] time as a dentist will improve."

131.   In clear reference to the fact that he was in fact being paid only based on collections and not the 48 clinical hour guarantee, he protested that: "**my income is actively being sacrificed as a result**" of Defendants' failures to provide him with a sufficient schedule of patients.

132.   Dr. Samirah alleged in the first paragraph that his "presence" was being "under-utiliz[ed]."

133.   Importantly, in this same email, Dr. Samirah alleged that 25-minute exams were over-scheduled for an hour-and-a-half.

134.   Dr. Samirah further alleged that, because new patient appointments required that the patient meet with Dr. Samirah, Defendant Powell, and dental assistant Figueredo, Dr. Samirah spent two-thirds of every

18

new patient's appointment "sitting around, waiting for something to do," while

uncompensated.

135.    Had Defendants fulfilled their contractual duty to provide 48

clinical hours of work, Dr. Samirah would have had busy days full of

appointments.

136.    New patient appointments constituted approximately one-third of

the daily schedule.

137.    Dr. Seifi had imposed a "no double-booking" policy in or around

March 2019, which meant that Dr. Samirah was not allowed to meet with more

than one patient at a time, despite the standard practice being three patients at a

time.

138.    Defendants ostensibly hoped that this policy, too, would reduce the

appearance of damages created by their contract breach.

139.    Dr. Samirah asked to be relieved of coming to the office on

Thursdays and Fridays, pointing out that Defendant Powell never once provided

enough hours in a week and that there was no functional benefit in requiring Dr.

Samirah to merely sit in the office unpaid.

140.    Dr. Samirah continued his email by requesting to be removed from

Thursdays and Fridays, so as to compress the meager patient appointments to

lesser days in a week so that he would not be forced to drive one-and-a-half

hours per just to staff an empty dental practice while unpaid.

141. Defendant Kimmel responded, also on May 7, 2019, in part, by agreeing that there should be a meeting.

**At In-Person Meeting, Dr. Samirah Reiterates his Opposition to the Failure to pay him in Accordance With the Contract and his Opposition, and Defendants Beseech him to buy District Smiles or Resign**

142. After May 7, but before May 27, a meeting between Dr. Seifi, Dr. Samirah, Kimmel, and Powell occurred at the back office of District Smiles.

143. Dr. Samirah stated explicitly that he objected to being required to perform "uncompensated work" and that Defendants contractually agreed to providing him 48 clinical hours a week.

144. Dr. Samirah also stated that racism had been unaddressed.

145. Thus, he directly protested that Figueroa had suggested he could be a terrorist in a clear reference to his race and religion.

146. Defendant Kimmel told Dr. Samirah during this meeting that Defendants wanted him to buy the practice or resign.

**When Dr. Samirah Fails to Agree to buy the Practice, Defendants Continue Seeking to Persuade him to do so or to Resign, and Allege Contract Breaches**

147. On May 27, 2019, having been rejected in efforts to be paid in accordance with the existing agreement, Dr. Samirah wrote to Defendant Kimmel, asking that the formula for his commissions be changed to eliminate certain deductions.

148. Dr. Samirah further stated his intention to cease working Tuesdays, Thursdays, and Fridays, because District Smiles had continued to provide only

20

paltry clinical hours and had attempted to spread patient appointments out over several days, increasing the amount of time Dr. Samirah was required to sit idly by while fully uncompensated.

149.    The changes would have effectively made up some of the gap between the compensation promised to Dr. Samirah and that actually being paid.

150.    The proposed changes would have also reduced the damage being inflicted upon Dr. Samirah from the time wasted in hanging around District Smiles uncompensated.

151.    Defendant Kimmel responded, however, by refusing to agree to any changes, alleging that *Dr. Samirah* was breaching the contract by "all these changes and other factors" and asked if Dr. Samirah was providing 45 days' notice of resignation.

152.    Dr. Samirah wrote back that there were insufficient patients even for just Sunday, Monday and Wednesday, and asked what "breaches" Defendant Kimmel was referring to.

153.    Defendant Kimmel responded without specifying breaches, but instead asserting that she would have an attorney send him a list of breaches and pestered him again as to whether he planned to resign.

154.    As their correspondence continued, Dr. Samirah said he wished to take off Tuesdays, starting "tomorrow," because he was scheduled to be present from 7:00 a.m. to 4:00 p.m., but Defendants had only scheduled him for appointments between 7:00 a.m. and 9:00 a.m.

21

155.    At 6:36, Dr. Samirah wrote: "[n]eeding to call in your attorney to find contractual breaches that did not exist until I asked for a pay raise, today, is unnecessary in a team environment. . ." He added that she had asked twice that day for his resignation.

156.    At 6:53 PM, Defendant Kimmel wrote back falsely alleging that Dr. Samirah continued to "insult me, threaten me, make false accusations and use unprofessional language."

**Defendants Demand Again That Dr. Samirah Resign or buy the Practice**

157.    Despite his various protests, Defendants never compensated Dr. Samirah according to the contractual requirement that they "shall offer Dr. Samirah no less than forty-eight (48) hours of clinical working hours each week."

158.    Notably, Dr. Samirah's employment agreement also includes an "Entire Agreement" clause. This clause states, "[t]his Agreement constitutes the sole and entire agreement of the parties with respect to the matters contained herein, and any representation, inducement, promise, or agreement, whether or oral or written, which pertains to such matters and is not embodied herein shall be of no force or effect."

159.    Therefore, Defendants had no justification for their  modifications and breaches.

160.    Dr. Samirah was not provided with a full-time slate of patients at District Smiles and would often complete his long commute only to be provided with minimal work that did not satisfy the contractual terms.

22

161.    After he strenuously protested the unfair treatment yet again on May 27, on May 28, Dr. Samirah received an email from Defendants' attorney, Mr. Strisik, demanding that he either resign or buy the practice from Defendants.

162.    At the Unemployment Hearing, Defendant Powell characterized Strisik's May 28 email as the first written reprimand provided to Dr. Samirah.

163.    At the Unemployment Hearing, Defendant Powell testified that all the particulars alleged against Dr. Samirah in the May 28 Strisik email were reported by himself to Defendant Seifi and/or Defendant Kimmel.

164.    Defendants still did not suggest grounds or intent to fire Dr. Samirah.

165.    Dr. Samirah informed Defendants that he was not interested in buying District Smiles.

166.    On June 17, 2019, Defendant Kimmel verbally stated to Dr. Samirah over the phone, "Either resign or purchase the [District Smiles] practice."

167.    Dr. Samirah again responded by informing Defendants that he was not interested in buying Defendants' practice.

**Dr. Samirah is Fired**

168.    On June 17, 2019, Defendant Seifi told Dr. Samirah that, effective at the close of business, he was fired.

169.    Defendants now allege that Dr. Samirah breached his employment contract.

23

170. To the extent that Defendants later alleged that these "breaches" were a form of misconduct, Defendants never disciplined Dr. Samirah during his employment or warned of any disciplinary action.

171. Nor did Defendants ever impose a negative performance appraisal upon Dr. Samirah or propose a Performance Improvement Plan.

172. Indeed, only after he protested race and religious hostility in the workplace, as well as the unlawful pay situation, and insisted that he would not purchase the practice, did Defendants concoct alleged offenses to accuse him of.

173. Thus, on June 18, 2019, Attorney Strisik wrote to Dr. Samirah, informing him that his employment was terminated effective June 17, 2019.

174. Specifically, Defendant District Smiles alleged that Dr. Samirah "neglected [his] duties under the rules, regulations and policies of District Smiles and show[ed] an inability to work with and relate to others including District Smiles ancillary staff."

175. Strisik added the allegation that: "Most recently you improperly accessed patient records and copied phone numbers onto your personal device."

176. It was only after his repeated requests to address the contract compensation disparity, his protest of a discriminatory atmosphere, and refusal to buy the practice that Dr. Samirah's employment was terminated.

177. Dr. Samirah was terminated because of the racial, religious, and sexual animus that he faced, his assertions to Defendants Powell and Kimmel of

opposition to racial and religious discrimination, and his demand for his

contractual compensation.

178.    Defendants' alleged reasons for firing Dr. Samirah are pretextual.

**Defendants Offer a Replacement for Dr. Samirah the Very Compensation he Sought—Even Though she was Straight out of Dental School**

179.    Just after firing him, Defendants made an employment offer to

replace Dr. Samirah with a female dentist who was straight out of dental school,

and who did not present as Black or as a practicing Muslim, Dr. Mina Jassam.

180.    Defendants offered to pay Dr. Jassam a guaranteed minimum

salary of $650 *per day* & 35% of collections, whichever of the two was higher.

181.    Dr. Jassam's percentage offer was commensurate with what Dr.

Samirah requested in writing on May 27, 2019 but was denied.

182.    Dr. Jassam's guaranteed minimum offer was consistent with what

Dr. Samirah should have received under the contract, but which Defendants

never paid on account of not providing sufficient patients, and which Defendants

fired him for demanding.

**Defendants Falsely Allege That Dr. Samirah was Fired for Committing Gross Misconduct**

183.    Defendants challenged Dr. Samirah's application for

unemployment compensation.

184.    Defendant Powell represented District Smiles at the evidentiary

hearing.

185.    Defendant Powell testified under oath at the Unemployment Hearing that Dr. Samirah had committed gross misconduct.

186.    Defendant Powell testified under oath at the Unemployment Hearing that prior to June 15, 2020, he did not know what the Mueller report was.

187.    Defendant Powell testified at the Unemployment Hearing that Dr. Samirah was terminated due to the fact that he was not following the wishes of the owner of the practice.

188.    Defendant Powell admitted at the Unemployment Hearing that Dr. Samirah was not fired for dishonesty.

189.    Defendant Powell testified at the Unemployment Hearing that he was unaware of the contract provision requiring Dental Smiles to provide Dr. Samirah with 48 clinical hours per week, alleging that he had never read the agreement and that no one had ever told him about that provision.

190.    Defendant Powell testified at the Unemployment Hearing that marketing was not a component of Dr. Samirah's duties.

### STATEMENT OF CLAIMS

### COUNT I:    BREACH OF CONTRACT
### AGAINST DEFENDANT DISTRICT SMILES

191.    Dr. Samirah incorporates all the above paragraphs by reference.

192.    "To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of

26

the contract; (3) a breach of that duty; and (4) damages caused by breach." *Francis*

*v. Rehman*, 110 A.3d 615, 620 (D.C. 2015); see also *Daisley v. Riggs Bank, N.A.*, 372

F. Supp. 2d 61, 70 (D.D.C. 2005) ("Notwithstanding an at-will employment

agreement, an employee and employer may still contract regarding other terms,

such as bonuses or stock options.").

193.    "However, to state a claim for breach of contract so as to survive

a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the

terms of the alleged contract and the nature of the defendant's breach." *Francis*,

110 A.3d at 620 (emphasis added).

194.    In this case, Defendant entered into an employment contract with

Plaintiff in which it agreed that it "shall" provide him with 48 hours'

compensated clinical work per week.

195.    However, Defendant never actually provided that contractually

required compensation level, instead pretending that the provision was not

present in the contract and only paying Dr. Samirah a percentage of actual

collections for whatever patients they were able to provide.

196.    Defendant District Smiles breached the contract again when it

demanded that Dr. Samirah perform many hours of uncompensated work

instead of the 48 clinical hours required by the contract, and when he resisted,

insisting that such performance was a condition of employment, and when he

continued to resist, firing him in retaliation.

27

197.    Through its actions, Defendant District Smiles caused significant

damage to Dr. Samirah.

## COUNT II:   FAILURE TO PAY WAGES IN VIOLATION OF D.C. CODE ANN. § 32-1301 et seq, AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL, AND POWELL

198.    Dr. Samirah incorporates all the above paragraphs by reference.

199.    D.C. Code § 32-1301(3) defines "wages" as

(A) Bonus;

(B) Commission;

(C) Fringe benefits paid in cash;

(D) Overtime premium; and

(E) Other remuneration promised or owed:

(i) Pursuant to a contract for employment, whether written or oral;

(ii) Pursuant to a contract between an employer and another person or

entity; or

(iii) Pursuant to District or federal law.

200.    Under the District of Columbia Wage Payment and Collection Law

("DCWPCL") § 32-1301(3)(A), "wages" are defined to include all monetary

compensation, regardless of how the amount owed is determined. *See Molock v.*

*Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 134 (D.D.C. 2018).

201.    Under the DCWPCL, employees are entitled to promise hourly

wages even if an employment agreement is merely oral. *See* D.C. Code Ann. § 32-

1302; *Pleitez v. Carney*, 594 F. Supp. 2d 47, 48 (D.D.C. 2009); *Sanchez v. Magafan*, 892 A.2d 1130, 1134 (D.C. 2006).

202.    A Plaintiff must be able to identify the criteria for bonuses, whether there was any written document of the policy, who decided bonus amounts, or other important aspects of the policy. *See Dorsey v. Jacobson Holman*, PLLC, 756 F. Supp. 2d 30, 36 (D.D.C. 2010).

203.    The DCWPCL, D.C. Code § 32-1302, requires that employers pay *all* wages on regular paydays designated in advance by the employer, not just overtime or minimum wages.

204.    If an individual has the right to control and direct the work of an individual as to both results, details, or means and manner of achieving job performance, such individual is an "employer" within the meaning of D.C. Code § 32-1302.

205.    "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an  employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Ruffin v. New Destination*, 800 F. Supp. 2d 262, 269 (D.D.C. 2011) (*citing Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983); *see also Wilson v. Hunam Inn, Inc.*, 126 F. Supp. 3d 1, 5 –6 (D.D.C. 2015) (same); Perez v. C.R. Calderon Constr., Inc., 221 F. Supp. 3d 115, 143 –44 (D.D.C. 2016) (Howell, J.).

206.    Furthermore, "the DCWPCL is construed consistently with the FLSA," rendering Defendants' failure to pay immediately actionable upon delay.

29

*See Amaya v. Logo Enters., LLC*, 251 F. Supp. 3d 196, 198 n.1 (D.D.C. 2017) (quoting

*Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 6 (D.D.C. 2010)).

207.    Here, the individual Defendants, the owner and her close kin, who

were also formally tasked with running District Smiles, had the right to control

and direct the work of Dr. Samirah as to results, details, or means and manner of

achieving job performance, such that these individuals were "employers" within

the meaning of D.C. Code § 32-1302.

208.    By failing to pay the promised compensation according to the

contract formula, Defendants failed to provide the promised employment

remuneration and violated the statute.

209.    Plaintiff Samirah suffered compensable financial damages as a

result of the violation.

**COUNT III:        DISCRIMINATORY PAY PRACTICES ON ACCOUNT
OF RACE, SEX, AND RELIGION, IN VIOLATION OF THE DCHRA, AND
RACE IN VIOLATION OF  42 U.S.C. § 1981, AGAINST DEFENDANTS
DISTRICT SMILES, SEIFI, KIMMEL, AND POWELL**

210.    Dr. Samirah incorporates all the above paragraphs by reference.

211.    As set forth above, Defendants refused to live up to their contract

bargain with Dr. Samirah, by refusing to pay him the mandatory 48 hours'

weekly compensation and by requiring him to be available and on-premises

without any compensation for additional time.

212.    However, after firing Dr. Samirah, Defendants offered his prior

position to a replacement, Dr.  Jassam.

213.   Dr. Jassam is a woman who, like Defendants Seifi and Kimmel, is an outwardly non-religious Muslim.

214.   Unlike Dr. Samirah, Dr. Jassam does not identify as Black or have a history of protesting unfair pay or prior discrimination by Defendants.

215.   Defendants offered to compensate Dr. Jassam, who—unlike Dr. Samirah—was straight out of dental school, with the very compensation terms that Dr. Samirah had sought from Defendants when they failed to satisfy the 48 clinical hour guarantee which they promised, thereby engaging in discriminatory disparate treatment.

216.   Plaintiff Samirah suffered compensable emotional and financial damages as a result of this disparate treatment.

**COUNT IV:      DISCRIMINATORY FIRING ON ACCOUNT OF RACE IN VIOLATION OF 42 U.S.C. § 1981, AND ON ACCOUNT OF RACE, SEX AND RELIGION, IN VIOLATION OF THE DCHRA AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL AND POWELL**

217.   Dr. Samirah incorporates all the above paragraphs by reference.

218.   As shown in the facts, Defendants harbored and condoned discriminatory attitudes against Black people and religious Muslims and offered discriminatorily superior employment terms to a woman.

219.   Defendants fired Dr. Samirah and are attempting to justify it by concocting alleged performance deficiencies which are merely pretexts for discrimination.

31

220.    For instance, Defendants alleged that he failed to inform them that he was running for political office, when in fact he did so inform them.

221.    The individual Defendants "acted in the interest of" and/or "aided and abetted" District Smiles in the termination, within the meaning of the Human Rights Act.

222.    The individuals participated in the adverse action and/or acted with discriminatory motive as required by 42 U.S.C. § 1981.

223.    Plaintiff Samirah suffered compensable emotional and financial damages as a result of the violation.

## COUNT V:   UNLAWFUL RETALIATORY FIRING IN VIOLATION OF 42 U.S.C. § 1981 AND THE DCHRA, AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, AND KIMMEL

224.    Dr. Samirah incorporates all the above paragraphs by reference.

225.    It is unlawful under the DCHRA and under The Civil Rights Act of 1866, 42 U.S.C. § 1981, for an employer to retaliate against an employee or other person for taking protected actions against it.

226.    Under the U.S. Supreme Court's ruling in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), a retaliatory action can form the basis of a claim if it would tend to deter employees or others from making a discrimination complaint.

227.    As discussed above, Dr. Samirah opposed Defendants' discrimination in April and May 2019, by calling out Powell's bigoted statements, complaining to Kimmel about racial discrimination, and complaining

to Defendants Kimmel, Seifi and Powell about islamophobia—specifically being called a terrorist by Figueroa, and continuing to object to being called "Abraham" by Kimmel and Seifi.

228.   Shortly after he raised these dire concerns in a mid-May meeting at the District Smiles facility, Defendants requested that Dr. Samirah resign or purchase the practice, and when he would do neither, fired him.

229.   As Defendants' actions in response to Dr. Samirah's protests, in theory, could easily deter a reasonable employee from making a complaint, Defendants have violated the anti-retaliation provisions of the DCHRA.

230.   The individual Defendants "acted in the interest of" and/or "aided and abetted" District Smiles in the termination, within the meaning of the Human Rights Act.

231.   The individual Defendants participated in the adverse action and/or acted with retaliatory motive as required by 42 U.S.C. § 1981.

232.   Defendants have offered pretextual excuses to justify the firing.

233.   Defendants have thereby caused Samirah damages, both financial and emotional.

**COUNT VI:   UNLAWFUL RETALIATORY FIRING IN VIOLATION OF THE DCWPCL, D.C. CODE § 32-1311(a)(1), AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL AND POWELL**

234.   D.C. Code § 32-1311(a)(1)  renders it unlawful for any employer to discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee or person because that employee or person has: "(1) Made

33

or is believed to have made a complaint to his or her employer. . . or to any other person that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter or the Living Wage Act, or any regulation promulgated pursuant to this chapter or the Living Wage Act[.]"

235.   "One of the activities protected under the WPCL includes making a complaint to one's employer that the employer violated a provision of the law. D.C. Code § 32-1311(a)(1)." *Sivaraman v. Guizzetti & Associates*, No. 18-CV-1201 D.C. Court of Appeals (June 11, 2020).

236.   Here, as shown in the facts, Dr. Samirah protested Defendants' failure to pay him as promised to Defendant Powell on April 8, 2019.

237.   Upon information and belief, Powell conveyed the complaint to Defendants Kimmel (his stepdaughter) and Seifi (his wife) shortly thereafter.

238.   Dr. Samirah again protested his compensation to Defendant Kimmel by email on May 7.

239.   Dr. Samirah again protested his compensation to Defendants Kimmel, Seifi and Powell, in an in-person mid-May 2019 meeting at the District Smiles facility, specifically alleging that Defendants had him performing "uncompensated work[,]" had him "sitting around, waiting for something to do" (while being paid solely on commission).

240.   Pursuant to D.C. Code § 32-1311(b), it was not necessary for Dr. Samirah's "complaint[s] or other communication[s] [to] make explicit reference

34

to any section or provision" of the statute to trigger its anti-retaliatory
protections.

241.    Defendants terminated Dr. Samirah's employment because he, in
good faith, demanded correction to the failure to provide his contractual
compensation and the compensation which Defendants promised him, which is a
protected act under the DCWPCL.

242.    The individual Defendants, the owner and her close kin who were
also formally tasked with running District Smiles, had the right to control and
direct the work of Dr. Samirah as to results, details, or means and manner of
achieving job performance, such that these individuals were "employers" within
the meaning of D.C. Code § 32-1302.

243.    Under D.C. Code § 32-1311(b), when the employer or any person
acting on behalf of the employer takes adverse action against an employee within
90 days of an employee or other person's engagement in statutorily-protected
activities, there is a legal presumption that such action is retaliation, which may
be rebutted only by clear and convincing evidence that such action was taken for
other permissible reasons.

244.    Defendants have offered pretextual excuses to justify the firing.

245.    By retaliatorily firing Dr. Samirah within less than three months
after his protected activities of April 8, May 7 and mid-May 2019, Defendants
caused him substantial financial damage, in violation of D.C. Code § 32-1311(b)

**REQUEST FOR RELIEF**

35

**WHEREFORE, the Plaintiff, Dr. Samirah, prays that the Court grant**

**him the following relief:**

(a)     Full back pay, lost income, and benefits.

(b)     "Mandatory liquidated damages equaling three times the amount

of unpaid wages." See D.C. Code § 32-1308(a)(1)(A)(ii); [1]

(c)     Lost compensation, civil penalty, and liquidated damages pursuant

to D.C. Code § 32-1311(b);

(d)     Compensatory damages under the DCHRA and 42 U.S.C. § 1981,

in an amount to be determined by the jury in accordance with the proof at trial,

for the emotional and consequential harms caused by Defendants. *See ruz v. Ruby*

*Constr. Assocs., LLC*, No. 1:17-cv-00349 (LO/IDD), 2017 U.S. Dist. LEXIS 219276,

at *12 (E.D. Va. Dec. 8, 2017);

(e)     Any relief available pursuant to D.C. Code §32-1311(c).

(f)     Punitive damages;

(g)     Prejudgment and post judgment interest;

(h)     Reasonable attorneys' fees, expenses and costs;

(i)     Posting of notices on Defendants' premises notifying employees

that Defendants have violated the anti-discrimination laws and that employees

who report future violations may not be subject to retaliation;

---

1 *Sivaraman v. Guizzetti & Associates*, No. 18-CV-1201 *Herrera v. Mitch O'Hara LLC*, 257 F.
Supp. 3d 37, 2017 WL 2869410, at *5 (D.D.C. 2017) (citing D.C. Code § 32-
1308(a)(1)(A)(ii)).

(j)     Injunctive relief, including but not limited to: an order reinstating

Dr. Samirah to employment and such other equitable relief as necessary to

effectuate the statutes' purposes; and

(k)     Such other relief as the court shall deem just and proper.

## JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

Leizer Z. Goldsmith
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 926-3535
Email: lgoldsmith@goldsmithfirm.com

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** ("Agreement") is entered this ___ day of September 2018 (the "Effective Date"), by and between **DISTRICT SMILES PLLC**, a District of Columbia Professional Limited Liability Company ("District Smiles"), and Ibraheem Samirah, D.D.S., an individual resident of the District of Columbia ("Dr. Samirah").

## RECITALS

**WHEREAS**, District Smiles is a Professional Limited Liability Company rendering dental services through its employees who are duly licensed to practice dentistry in the District of Columbia;

**WHEREAS**, during the term of the Agreement, the parties expect that Dr. Samirah will be a duly licensed dentist in the District of Columbia; and

**WHEREAS**, District Smiles desires to employ Dr. Samirah as a dentist, and Dr. Samirah desires to become employed by District Smiles, all on the terms and conditions set forth in the Agreement.

**NOW, THEREFORE**, in consideration of the Recitals, which shall be deemed to be a substantive part of the Agreement, and the mutual covenants and agreements hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1.** **Employment.** District Smiles hereby employs Dr. Samirah and Dr. Samirah hereby accepts such employment by District Smiles upon the terms and conditions set forth in the Agreement.

**2.** **Duties.**

**2.1.** **Best Efforts.** Dr. Samirah agrees to practice dentistry as an employee of District Smiles and shall devote his best efforts in the performance of his duties as a dentist for District Smiles.

**2.2.** **District Smiles Policies and Procedures.** Dr. Samirah shall be free to exercise his own judgment regarding the treatment of any patient; provided, that District Smiles reserves the right to review the determinations and decisions of Dr. Samirah in connection with the rendering of his professional services to determine whether recognized professional standards and ethics are being complied with by Dr. Samirah. Dr. Samirah agrees to observe and comply with all policies, rules and procedures of District Smiles as adopted from time to time by District Smiles in, among other things, its General Policies Manual and Employee Handbook. Dr. Samirah specifically agrees that District Smiles shall have the sole right, within reason, to designate and assign patients to Dr. Samirah for treatment and that the District Smiles shall determine the fees to be charged for professional services rendered by Dr. Samirah pursuant to his Agreement.

**2.3.** **Other Duties.** Additionally, Dr. Samirah shall perform such administrative, promotional and other duties related to his duties as reasonably requested by the officers of District Smiles which are customarily performed by or required of a dentist in the professional practice in the community. This shall include, but not be limited to, attending internal staff meetings and team huddles.

**2.4.** **Working Hours.** Dr. Samirah shall work during the normal business hours of District Smiles on those days he is scheduled. Dr. Samirah shall arrive 30 minutes prior to the first scheduled patient each day and shall remain on-site until his last patient's appointment concludes (or until he is otherwise authorized by District Smiles to leave). District Smiles reserves the right to prescribe the working hours for Dr. Samirah, including any specific coverage hours on an ongoing basis.

**2.5.** **Coverage.** Dr. Samirah shall provide on-call coverage, including evenings, weekends and holidays for District Smiles. Dr. Samirah agrees to provide District Smiles with thirty (30) days' notice of any scheduled leave so that patient on-call coverage can be determined.

**2.6.** **Limitation of Authority.** Dr. Samirah acknowledges and agrees that he may not enter into any transaction or agreement on District Smiles' behalf or bind District Smiles to any agreement, whether written or verbal, without the express prior written consent of District Smiles.

**3.** **Compensation.** For all the services to be rendered by Dr. Samirah in any capacity hereunder or any other duties assigned to him by District Smiles, District Smiles shall pay Dr. Samirah following compensation:

**3.1.** **Collections**. Dr. Samirah shall be compensated at a rate of thirty percent (30%) of the net collections of District Smiles less fifty percent (50%) of the laboratory fees associated with District Smiles patients. For purposes of this section, net collections shall mean the total net collections after any merchant fees, discounts and refunds. District Smiles reserves the right to change the compensation structure by providing Dr. Samirah with thirty (30) days prior written notice of such change.

**3.2.** **Payroll and Withholding.** The salary paid to Dr. Samirah shall be paid to him in accordance with District Smiles' customary payroll practices, or such payroll practices as are adopted by the District Smiles from time to time for its professional employees. All compensation paid to Dr. Samirah shall be subject to customary withholding and employment taxes.

**3.3.** **Termination or Expiration.** Upon the termination or expiration of Dr. Samirah's employment pursuant to the terms of the Agreement for any reason or no reason, all compensation payable to Dr. Samirah shall be paid through the date of termination or expiration. In the event that District Smiles is required, with respect to Dr. Samirah's services, to: (i) refund any amounts paid to it after the termination or expiration of Dr. Samirah's employment ("Refunds") or (ii) complete, adjust or redo any of the work or

services performed by Dr. Samirah (the "Replacement Work") after the termination or expiration of Dr. Samirah's employment, District Smiles shall offset the amount of any such Refunds and/or Replacement Work against any amounts otherwise owed to Dr. Samirah hereunder. This only pertains to Work that is prepared and seated by Dr. Samirah. If the amount of such Refunds and/or Replacement Work is more than the amounts otherwise due to Dr. Samirah, Dr. Samirah shall immediately, upon demand, repay to District Smiles such difference and such obligation shall survive the expiration or earlier termination of Dr. Samirah's employment. The provision to offset will be in effect for a period of six (6) months dating from the last day of clinical work performed by Dr. Samirah.

**4.** **Benefits.**

**4.1.** **Benefits.** Upon becoming eligible, Dr. Samirah shall be entitled to those benefits listed in the Employment Practices and General Policies in place at the location where Dr. Samirah is working. In further consideration of the performance by Dr. Samirah of services on behalf of District Smiles, District Smiles shall provide Dr. Samirah with the following benefits:

**4.1.1.** **Sick and Safe Leave**. Dr. Samirah is entitled to qualifying District of Columbia Sick and Safe Time Leave in accordance with District Smiles' policy on such leave.

**4.2.** **Working Facilities.** In addition to the benefits set forth above, District Smiles shall, at its own expense, provide suitable office space and facilities, furniture, fixtures, equipment, supplies, and other employees and assistants necessary or appropriate for the performance by Dr. Samirah of his duties hereunder.

**4.2.1.** **Treatment of Family**. Dr. Samirah may treat his family (including his spouse and children) without charge during non-business hours at District Smiles. However, Dr. Samirah will be responsible for any chair side assistance and lab fees associated with such care.

**4.3.** **Fringe**. In addition to the benefits set forth above, Dr. Samirah shall be eligible to participate in District Smiles' fringe benefit programs in accordance with the terms of such plans and/or programs and in proportion to the hours he works at District Smiles.

**5.** **Leave.** In addition to the compensation provided for in Section 3.1., above, District Smiles agrees to provide Employee during the term with certain paid leave in accordance with District Smiles' policies and procedures on leave. To the extent practical, Dr. Samirah shall provide thirty (30) day's advanced notice of any scheduled leave. All leave shall be subject to the prior approval of District Smiles, which approval shall not be unreasonably withheld. Dr. Samirah shall use best efforts to reschedule patients who were to be treated during such leave. Upon termination of Dr. Samirah's employment pursuant to the Agreement, for any reason, no compensation will be paid for any unused leave.

**6.** **Disability.** If Dr. Samirah is unable to perform his duties on a substantially full-time basis (whether with or without a reasonable accommodation) by reason of illness, injury or incapacity, Dr. Samirah shall first utilize his unused leave, if any. After Dr. Samirah exhausts his unused leave, he shall receive no additional unpaid leave until he returns to work. Dr. Samirah's full compensation shall be reinstated on his return to employment and resumption of his duties. If he remains unable to perform his duties on a substantially full-time basis by reason of illness, injury, or incapacitation for a continuous period of more than thirty (30) days (whether with or without a reasonable accommodation), then Dr. Samirah shall be deemed to be disabled.

**7.** **Outside Professional Activities.** Dr. Samirah may perform and render such teaching, lecturing, giving expert testimony, forensic chart review (other than with respect to a patient of District Smiles) and other activities (other than the practice of dentistry) as may be approved in writing, in advance, by the District Smiles. Upon approval, such fees or honorarium shall belong to and be the sole property of Dr. Samirah. Any such fees or honorariums received from teaching or lecture activities not so approved shall be immediately paid to and be the property of District Smiles.

**8.** **Term and Termination.**

**8.1.** **Term.** The term of employment under the Agreement shall be for a four (4) year period commencing as of the Effective Date and unless earlier terminated in accordance with its terms, shall then be automatically renewed for successive one (1) year terms.

**8.2.** **District Smiles Termination Without Cause.** District Smiles may terminate Dr. Samirah's employment pursuant to the Agreement, without cause, at any time, by providing written notice to Dr. Samirah at least thirty (30) days prior to the date of termination.

**8.3.** **Dr. Samirah Termination Without Cause.** Dr. Samirah may terminate his employment pursuant to the Agreement, without cause, at any time, by providing written notice to District Smiles at least sixty (60) days prior to the date of termination.

**8.4.** **District Smiles Termination with Cause.** District Smiles shall have the right to terminate Dr. Samirah's employment immediately in the event of any of any of the following circumstances:

**8.4.1.** Dr. Samirah's breach of any material term of the Agreement. Dr. Samirah will have 30 days to remedy any material breach to the satisfaction of the District Smiles.

**8.4.2.** Dr. Samirah's indictment of a felony, or Dr. Samirah's plea of guilty or no contest with respect to a felony charge.

**8.4.3.** The limitation, suspension, or revocation of Dr. Samirah's license to practice dentistry in the State of Maryland.

**8.4.4.**     The limitation, suspension, or revocation of Dr. Samirah's right to prescribe controlled substances.

**8.4.5.**     Dr. Samirah's neglect of duty under or violation of the rules, regulations, policies, and procedures of District Smiles.

**8.4.6.**     Dr. Samirah's inability to practice dentistry with reasonable skill and safety by reason of Dr. Samirah 's use of alcohol, drugs, chemicals, or any other type of controlled substances.

**8.4.7.**     Dr. Samirah's inability to work with and relate to others, including to but not limited to, District Smiles' patients and ancillary staff, in a respectful, cooperative and professional manner.

**8.4.8.**     Dr. Samirah's engaging in fraud, embezzlement, theft, or other dishonest or criminal conduct.

**8.4.9.**     Dr. Samirah's death or disability, as defined in Section 6.

**8.4.10.**     Upon District Smiles' cessation of business activity.

**8.4.11.**     Dr. Samirah's dishonesty with respect to any of the representations made in Section 13.

**8.4.12.**     Dr. Samirah's engaging in discrimination against any person based on race, gender, national origin, sexual orientation or disability or engaging in any type of sexual harassment.

**8.5.     Obligations on Termination.**  Upon the expiration or earlier termination of the Agreement, neither party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of expiration or termination, and (ii) obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of the Agreement, including but not limited to the non-competition, confidentiality, non-solicitation, and non-interference covenants contained in Section 14, all of which shall survive the expiration or earlier termination of Dr. Samirah 's employment pursuant to the Agreement.

**8.6.     Return of District Smiles Property.**  Dr. Samirah agrees that upon termination of his employment with District Smiles for any reason, Dr. Samirah shall promptly deliver to District Smiles all materials, whether written, descriptive, or maintained in some other form, relating to District Smiles, its business affairs, patients, and potential patients. Dr. Samirah shall also deliver such other property in his possession, including any equipment that was supplied to Dr. Samirah by District Smiles.

**9.     Professional Liability Insurance.**  Dr. Samirah is responsible to pay the cost of a professional malpractice insurance policy, in the amount of $1,000,000 per claim and $3,000,000

in the aggregate.  Upon the termination of Dr. Samirah's employment hereunder for any reason whatsoever, including the non-renewal of this Agreement, he shall ensure his then-current malpractice carrier is covering claims resulting from alleged acts or omissions of Dr. Samirah while employed by the District Smiles.  Said policy shall be in place at his expense for a period of one (1) year.

**10.** **Case Records and Histories.**  All case records, case histories, files and charts concerning patients of District Smiles or patients treated and cared for by Dr. Samirah and all copies thereof, shall belong to and remain the property of District Smiles.  Upon the expiration or earlier termination of Dr. Samirah's employment with District Smiles, Dr. Samirah shall return to District Smiles all such records in his possession.

**11.** **Dr. Samirah 's Representations.**  Dr. Samirah represents and warrants always during the term of the Agreement that:

**11.1.** **Legal Authority.**  As of the date of execution of the Agreement, he has the legal right to enter into the Agreement and perform the duties hereunder, and that he is not subject to or bound by any non-compete or other restrictive covenant that would impede or interfere in the performance of his duties hereunder.

**11.2.** **Controlled Substance Registration.**  Dr. Samirah has a current controlled substances registration issued by the State of Maryland and the United States Drug Enforcement Administration, which registrations have not been surrendered, suspended, revoked, or restricted in any manner.

**11.3.** **Full Disclosure.**  Dr. Samirah has disclosed and will disclose to District Smiles the following matters, whether occurring at any time during the past five (5) years prior to the date of the Agreement or at any time during the term of the Agreement:

**11.3.1.** Actual or threatened malpractice suit claim, whether or not filed in court.

**11.3.2.** Settlement, settlement allocation, judgment, verdict, or decree against Dr. Samirah;

**11.3.3.** Any disciplinary peer review or professional review investigation or action instituted against Dr. Samirah by any licensing board, hospital, dental school, health care facility or entity, professional society or association, third party payor, peer review or professional review committee or body or governmental agency;

**11.3.4.** Any criminal complaint, indictment, or criminal proceeding in which Dr. Samirah is named as a defendant;

**11.3.5.** Any investigation or proceeding, whether administrative, civil, or criminal relating to allegations against Dr. Samirah

filing false health care claims, violating anti-kick back laws, violating fee splitting laws or engaging in other billing improprieties;

**11.3.6.**    Any organic or mental illness or condition that impairs or is likely to impair Dr. Samirah's ability to practice dentistry;

**11.3.7.**    Any dependency on or habitual use or abuse of alcohol or controlled substances or any participation in any alcohol or controlled substance detoxification, treatment, recovery, rehabilitation, counseling, screening, or monitoring program;

**11.3.8.**    Any allegation or any investigation or proceeding based on any allegation against Dr. Samirah for violating professional ethics or engaging in illegal, immoral, or other misconduct (of any nature or degree), relating to the practice of dentistry; and

**11.4.    Record Keeping.** Dr. Samirah shall keep and maintain (or cause to be kept and maintained) appropriate records consistent with prevailing standards of dental practice and Dr. Samirah's relevant community relating to all professional services rendered by Dr. Samirah under the Agreement. He shall prepare and attend to, in connection with such services, all reports, claims, and correspondence necessary or appropriate under the circumstances as determined solely by District Smiles, all which records, reports, claims, and correspondence shall belong to District Smiles.

**12.    Assignment of Contracts; Billings and Fees.**

**12.1.    Assignment of Contract Rights.**  Dr. Samirah hereby irrevocably assigns to District Smiles all fees collected and all rights to the proceeds of billings, including but not limited to, fees owed or received pursuant to managed care contracts for the professional services of Dr. Samirah rendered during the term of the Agreement.  Dr. Samirah also agrees that whenever necessary, District Smiles shall be entitled to obtain and maintain, or transfer, any provider numbers necessary to bill and collect for services rendered by Dr. Samirah hereunder.  Dr. Samirah agrees that all fees for his professional services and for ancillary services furnished by District Smiles during the term of the Agreement shall be the property of District Smiles.

**12.2.    Grant of Power of Attorney.**  Dr. Samirah does hereby appoint Maryam Seifi of District Smiles as Dr. Samirah's attorney-in-fact for limited purposes to include the execution, delivery or endorsement of checks, applications for payment, insurance claim forms or other instruments required or convenient, as determined by District Smiles in its sole discretion, to fully collect, secure or realize all sums lawfully due to District Smiles for services rendered by Dr. Samirah under the Agreement. The power of attorney granted in the preceding sentence is coupled with an interest, is irrevocable and shall survive expiration or termination of Dr. Samirah's employment pursuant to the Agreement for a period not to exceed one (1) year.

**13.** **Covenants Not to Compete, Solicit, or Disclose Confidential Information.**

**13.1.** **Essence of the Agreement.** Dr. Samirah acknowledges that District Smiles is engaged in a highly competitive fee-for-service dental practice. Dr. Samirah acknowledges that in order to maximize the output of District Smiles' practice and the remuneration to be paid to Dr. Samirah and the other dentists that may be employed by District Smiles, from and after the date of the Agreement, District Smiles shall introduce and make available to Dr. Samirah all of its professional contacts and relationships, including without limitation, patients, referring dentists, managed care plans and Employees. If, after his introduction to and involvement with District Smiles' contacts and relationships, Dr. Samirah would solicit such individuals or entities or begin a practice in the Restricted Territory upon termination of his employment with District Smiles, the business and goodwill of District Smiles would suffer irreparable and substantial damages. Accordingly, Dr. Samirah acknowledges that District Smiles is entitled to protect its patients, referral sources, and Employees from any competition which would likely result if Dr. Samirah enters any dental practice like District Smiles or otherwise competes with the dental practice of District Smiles following the termination of his employment with District Smiles. Dr. Samirah acknowledges that there are other specialists in the field of dentistry in the Restricted Territory as well as such specialists associated with District Smiles who are fully competent to care for such referred and existing patients and therefore, the restriction does not operate as a restraint of trade. Dr. Samirah represents and acknowledges that his training and skills are such that enforcement of these covenants would not preclude him from earning a reasonable living. Dr. Samirah understands that the covenants contained in the Section 14 are the essence of the Agreement and without which, District Smiles would not enter into the Agreement with him. Dr. Samirah has been told of the extreme importance being placed on the covenants contained in the Section 14 and fully agrees to them.

**13.2.** **Covenant Not to Compete.** With the exception of the services and duties that Dr. Samirah performs for District Smiles or on District Smiles' behalf pursuant to the Agreement, Dr. Samirah agrees that during the term of the Agreement and for a period of two (2) years after the termination of Dr. Samirah 's employment pursuant to the Agreement for any reason whatsoever, including expiration, Dr. Samirah shall not within the Restricted Territory, directly or indirectly, compete with the business engaged in by District Smiles or any of District Smiles' owners or affiliates as of the date of such termination or expiration, or have any interest in any enterprise that so competes, whether as a proprietor, partner, member, employee, shareholder, principal, agent, consultant, director, officer, independent contractor, or in any other capacity or manner whatsoever. The Restricted Territory shall mean the entire geographic area within a five (5) mile radius of District Smiles' practice(s).

**13.2.1.** For purposes of the Section 13.2, the term "compete" means to:

**13.2.1.1** Engage in the practice of general dentistry or otherwise provide, or cause, request or permit others to provide,

dental services, treatment or care at an office, hospital, institution, treatment facility or other place of business for the rendering of dental services, treatment or care.

**13.2.1.2** Assist or attempt to assist with respect to the providing of capital needs, borrowing needs or credit needs, in any capacity whatsoever, whether as a lender, guarantor, accommodation party, financier, investor, or otherwise, any person or persons or entities of every nature or description, who or which shall be engaged, or intend to be engaged, in a business competitive with District Smiles' business in the Restricted Territory.

**13.2.2.** The provisions of Section 14.2.1.2 shall not be deemed to be breached solely by the fact that Dr. Samirah owns less than two percent (2%) of the stock of a corporation whose shares are traded on a national securities exchange.

**13.3.** **Non-Solicitation of Patients and Referring Dentists.** With the exception of the services and duties that Dr. Samirah performs for District Smiles or on District Smiles' behalf pursuant to the terms of the Agreement, Dr. Samirah agrees that Dr. Samirah shall not at any time whatsoever during the term of the Agreement or for two (2) years after the termination of his employment pursuant to the Agreement for any reason whatsoever, including expiration, directly or indirectly, contact or solicit any of District Smiles' Patients or Referring Dentists for the purpose of rendering dental services or have any interest in any enterprise that so contacts or solicits, whether as a proprietor, member, partner, employee, shareholder, principal agent, consultant, director, officer, independent contractor, or in any other capacity or manner whatsoever.

**13.3.1.** For purposes of the Section 13.3, the term "contact" means to initiate any written or oral communications with, or cause, request, or permit others to permit or initiate any written or oral communication with, any of District Smiles' Patients or Referring Dentists, except to the extent mandated by ethical considerations.

**13.3.2.** For purposes of the Section 14.3, the term "solicit" shall mean to solicit, attempt to solicit, divert, attempt to divert, or otherwise take away or attempt to take away from District Smiles, or cause, request, or permit others to solicit, attempt to solicit, divert, attempt to divert, or otherwise take away or attempt to take away from District Smiles the business or patronage of any of District Smiles' Patients.

**13.3.3.** For purposes of the Section 13.3, the term "Patients" means and refers to all individuals who received professional services, treatment, or care from District Smiles, Dr. Samirah, or any other dentist employed or engaged by District Smiles within twenty-four (24) months

immediately preceding the expiration or termination of Dr. Samirah's employment pursuant to the Agreement for any reason.

**13.3.4.** For purposes of the Section 14.3, the term "Referring Dentists" shall include any dentist who is currently referring patients to District Smiles or who has referred one or more patients to District Smiles within twenty-four (24) months immediately preceding the expiration or termination of Dr. Samirah's employment pursuant to the Agreement for any reason.

**13.3.5.** Examples of conduct prohibited hereunder prior to Dr. Samirah's termination of employment with District Smiles shall include but not be limited to (i) distributing to Patients new business cards or other forms of announcement stating the opening or location of Dr. Samirah's new practice; (ii) copying the dental or other records of District Smiles' Patients; (iii) instructing District Smiles' personnel to schedule dental appointments between Dr. Samirah and Patients subsequent to the termination date of Dr. Samirah's employment; and (iv) assembling or creating patient lists containing patient data, including but not limited to patient names, addresses, and/or telephone numbers of Patients from District Smiles' records. Conduct prohibited hereunder after Dr. Samirah's termination of employment with District Smiles shall include but not be limited to contacting District Smiles' Patients, directly or indirectly by means of telephone calls, written correspondence, or similar means to both inform them that Dr. Samirah has left the practice and to suggest that they contact Dr. Samirah at Dr. Samirah's new practice location.

**13.3.6.** Conduct not prohibited hereunder shall include (i) general announcements published in local newspapers of general circulation or broadcasted on radio and television informing the general public of Dr. Samirah's new practice location and circumstances, provided such publication or broadcast occurs after Dr. Samirah's termination of employment with District Smiles; and (ii) other conduct expressly agreed to in writing by District Smiles and Dr. Samirah.

**13.4.** **Non-Solicitation of Employees.** With the exception of the services and duties that Dr. Samirah performs for District Smiles or on District Smiles' behalf pursuant to the terms of the Agreement, Dr. Samirah agrees that Dr. Samirah shall not at any time whatsoever during the term of the Agreement or for two (2) years after the termination of Dr. Samirah's employment pursuant to the Agreement for any reason whatsoever, including expiration, directly or indirectly, hire or employ, discuss employment with, or encourage any of District Smiles' Employees to terminate or otherwise alter the terms of their employment with District Smiles, or cause or request others to do so, or assist others in doing any of the foregoing prohibited acts, or have any interest in any enterprise that so acts, whether as a proprietor, member, partner, employee, shareholder, principal agent, consultant, director, officer, independent contractor, or in any other capacity or manner

whatsoever. For purposes of the Section 14.4, the term "District Smiles' Employees" means and refers to all persons other than Dr. Samirah who are or were Employees of District Smiles at any time during the period of Dr. Samirah's employment with District Smiles.

**13.5. Confidentiality.** Dr. Samirah acknowledges that in connection with her employment by District Smiles, Dr. Samirah will acquire and make use of confidential information and trade secrets of District Smiles, including by not limited to business plans, methods of operation, pricing policies, marketing strategies, patient records, patient lists, financial statements, research, experimental work, contracts, and other materials or records of a proprietary nature ("Confidential Information"). In order to protect the Confidential Information, Dr. Samirah agrees that he shall not, during the term of the Agreement or for so long as any such Confidential Information may remain confidential, not readily available to the general public, or otherwise wholly or partially protectable, use such information except in connection with Dr. Samirah's employment by District Smiles, or divulge the Confidential Information to a third party unless District Smiles consents in writing to such use or divulgence, or Dr. Samirah is ordered or directed by a court or administrative body having jurisdiction over Dr. Samirah to make such use or divulgence and Dr. Samirah informs District Smiles of such order or direction. Dr. Samirah shall be permitted to disclose such Confidential Information to Dr. Samirah's attorney and/or accountant in connection with their provision of professional services to Dr. Samirah if disclosure of such Confidential Information is required to permit such person to provide professional services to Dr. Samirah and if such person is informed of the confidential nature of the Confidential Information and the restrictions contained herein and agrees to be bound by the same.

**13.6. Reasonableness of Restrictions.** Dr. Samirah has carefully read and considered the provisions of the Section 14, and, having done so, agrees that the restrictions set forth in the Section, including, but not limited to, the time period of restriction and geographical areas of restriction are fair and reasonable and are reasonably required for the protection of the interests of District Smiles and its Affiliates, officers, directors, shareholders, and other employees. In the event that, notwithstanding the foregoing, any of the provisions of the Section 14 shall be held to be invalid or unenforceable, the remaining provisions thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included herein. In the event that any provision of the Section 14 relating to the time period and/or the areas of restriction and/or related aspects shall be declared by a court of competent jurisdiction to exceed the maximum restrictiveness such court deems reasonable and enforceable, the time period and/or areas of restriction and/or related aspects deemed reasonable and enforceable by the court shall become and thereafter be the maximum restriction in such regard, and the restriction shall remain enforceable to the fullest extent deemed reasonable by such court.

**13.7. Remedies for Breach of Covenants.** Dr. Samirah hereby acknowledges and agrees that the breach or threatened or attempted breach of any provision of the Section 14 will cause irreparable harm to District Smiles for which any remedies at law would be inadequate. Accordingly, in the event of any breach or threatened or attempted breach of any such provision by Dr. Samirah, District Smiles shall, in addition to and not to the

exclusion of any other rights and remedies at law or in equity, be entitled to *(i)* full temporary, interlocutory and permanent injunctive relief enjoining and restraining Dr. Samirah and each and every other person, firm, organization, association, partnership, corporation, institution or entity affiliated or associated with him from the continuation of such violative acts, and *(ii)* a decree for specific performance of the provisions hereof. In any such case, District Smiles shall not be required to show actual damage or irreparable harm, or to furnish any bond or other security, and Dr. Samirah covenants not to plead in defense thereto that there is or would be an adequate remedy at law. Dr. Samirah consents to the foregoing and further agrees to indemnify District Smiles for all reasonable costs, including attorney's fees, incurred by District Smiles in enforcing the provisions of the Section 14 of the Agreement.

**14.** **Indemnification:** Dr. Samirah hereby agrees to indemnify, defend and hold harmless District Smiles, and its officers, directors, shareholders, employees and agents, from any claim, loss, damage, costs, expense or liability (including reasonable attorneys' fees) arising out of or relating to the performance or non-performance by Dr. Samirah of any services to be performed or provided by him under the Agreement and for the breach of any of the representations and warranties contained in Section 12. Dr. Samirah shall not, however, be required to provide any indemnity or make any reimbursement to District Smiles or its officers, directors, shareholders, employees or agents for any claims, losses, damages, costs, or expenses which are covered by any insurance policy or is reimbursed from any other source.

District Smiles shall indemnify, defend and hold harmless Dr. Samirah, his heirs and assigns, from and against all claims, losses, damages, costs or expenses incurred by Dr. Samirah, his heirs and assigns, solely as a result of any acts or omissions of District Smiles or its officers, directors, shareholders, employees or agents.

**15.** **Miscellaneous.**

**15.1.** **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal and legal representatives, successors and permitted assigns.

**15.2.** **Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties with respect to the matters contained herein, and any representation, inducement, promise, or agreement, whether oral or written, which pertains to such matters and is not embodied herein shall be of no force or effect.

**15.3.** **Governing Law.** This Agreement shall be interpreted, construed, and governed according to the internal laws of the District of Columbia, without reference to its choice of law rules.

**15.4.** **Future Acts.** Each party agrees to execute and deliver such documents and perform such acts, which are or may become necessary to effectuate and carry out the purposes of the Agreement.

**15.5.** **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and together shall constitute one and the same Agreement.

**15.6.** **Invalid Provisions.** In case any term of the Agreement shall be held invalid, illegal, or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of the remaining terms of the Agreement shall in any way be affected thereby.

**15.7.** **Waiver of Breach.** No waiver of any breach of any provision of the Agreement shall constitute a waiver of any prior, concurrent, or subsequent breach of the same or any other provision hereof and no waiver shall be effective unless made in writing. No waiver of any of the provisions of the Agreement shall be deemed a waiver of any other provision, irrespective of similarity, or shall constitute a continuing waiver unless otherwise expressly provided. Except as otherwise provided herein, no delay or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under the Agreement shall impair any such right, power, or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later.

**15.8.** **Notices.** Any notice or other communication required or permitted pursuant to the Agreement shall be in writing and shall be furnished either by personal delivery or sent by facsimile, overnight mail, or by certified mail, return receipt requested. In the case of District Smiles, notice shall be sent to 5930 Hubbard Drive, Rockville MD 20852. In the case of Dr. Samirah, notice shall be sent to his address on file in his employment record. Any such notice or communication shall be deemed received (i) at the time of delivery if sent by personal delivery, (ii) at the time of transmission if sent by facsimile; provided that evidence of transmission to the recipient is obtained, (iii) on the date of delivery in the case of overnight mail, and (iv) three business days following proper mailing thereof with postage prepaid in the case of certified mail.

**15.9.** **Amendment.** This Agreement may be amended only by a written instrument signed by all the parties.

**15.10.** **Signatures.** Any signature transmitted by facsimile, e-mail, or other electronic means shall be deemed to be an original signature.

**15.11.** **Review by Counsel.** Each party acknowledges that such party has been given an opportunity to have the Agreement reviewed by the counsel of such party's choice. Each party further acknowledges that the Agreement has been so reviewed or that such party has determined to waive such review.

**15.12.** **Expenses.** Each party shall pay its own expenses incident to the negotiation and preparation of the Agreement. Notwithstanding the foregoing, however, if District Smiles is required to enforce its rights under the Agreement by legal proceedings, Dr.

Samirah shall pay all reasonable costs and expenses incurred by District Smiles, including without limitation all reasonable attorney's fees and costs.

**15.13. Jurisdiction and Venue.** Any suit involving any dispute or matter arising under the Agreement may only be brought in the United States District Court for the District of Maryland or any Maryland State Court having jurisdiction over the subject matter of the dispute or matter. All parties hereby irrevocably consent to the exercise of personal jurisdiction and venue by any such Court with respect to any such proceeding.

**15.14. Section Headings.** The Section headings contained in the Agreement are for convenience only and in no manner shall be construed as a part of the Agreement.

**15.15. Terms.** Terms, nouns, and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the party may in the context require.

**15.16. Time of the Essence.** Time is of the essence with respect to all of the provisions of the Agreement.

**15.17. Assignment.** Neither party may assign the Agreement or any of its rights or delegate any of its duties under the Agreement without the prior written consent of the other party.

**IN WITNESS WHEREOF,** the undersigned have executed the Agreement as of the date first written above.

**WITNESS:**                                **DISTRICT SMILES:**

                                            MARYAM SEIFI D.D.S.

_____          By:_____(SEAL)
                                            Maryam Seifi, DDS

                                            **EMPLOYEE:**

_____          By: _____(SEAL)
                                            Ibraheem Samirah D.D.S.

**Ibraheem S. Samirah**

| | |
|---|---|
| **From:** | Nina Kimmel -CFO COO <Nina@starbriteteam.com> |
| **Sent:** | Saturday, March 30, 2019 12:18 PM |
| **To:** | Ibraheem Samirah; seifidds@yahoo.com; Eliana Figueredo; William Powell |
| **Subject:** | Nice Reviews DS!! Go team! |



Home | About Us | Services | Book Online | Contact Us

# What District Smiles Patients Are Saying.
## Here Are Just a Few Patient Reviews!



*"Amazing service and comfortable environment."* - **K.T.**

*"I was very impressed by the bedside manner and professionalism at District Smiles."* - **A.N.**

*"The service at District Smiles is a great dental experience."* - **E.S.**

*"District Smiles is by far the best dental office I've ever been to."* - **D.V.**

*"A very friendly environment!"* - **J.V.**

At **District Smiles** our experienced team strives to provide the best in patient dental care. Contact us today to schedule your next visit by calling (202) 363-4361. Our goal is to help you regain your oral health and keep it that way.

1

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH

## INFORMATION SHEET

Ibraheem Samirah, DDS

Case Number: **2020 CA 002808 B**

vs

Date: 06/16/2020

District Smiles, PLLC, et al.

☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)* Leanza Bethel | Relationship to Lawsuit |
| --- | --- |
| Firm Name: The Goldsmith Law Firm, LLC | ☑ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.: Six digit Unified Bar No.: (202) 926-3538       1672405 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury        ☐ 6 Person Jury        ☑ 12 Person Jury

Demand: $ __Amount to be determined by jury.__        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____        Judge: _____        Calendar #: _____

Case No.: _____        Judge: _____        Calendar#: _____

---

**NATURE OF SUIT:** *(Check One Box Only)*

**A. CONTRACTS**                                **COLLECTION CASES**

☑ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☑ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied
☐ 27 Insurance/Subrogation                      ☐ 26 Insurance/Subrogation
        Over $25,000 Pltf. Grants Consent              Over $25,000 Consent Denied
☐ 07 Insurance/Subrogation                      ☐ 34 Insurance/Subrogation
        Under $25,000 Pltf. Grants Consent            Under $25,000 Consent Denied
☐ 28 Motion to Confirm Arbitration
        Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile                     ☐ 03 Destruction of Private Property      ☐ 05 Trespass
☐ 02 Conversion                     ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile, Not Malpractice)

☐ 17 Personal Injury- (Not Automobile, Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**OTHERS**

☐ 01 Accounting
☐ 02 Att. Before Judgment
☐ 05 Ejectment
☐ 09 Special Writ/Warrants
   (DC Code § 11-941)
☐ 10 Traffic Adjudication
☐ 11 Writ of Replevin
☐ 12 Enforce Mechanics Lien
☐ 16 Declaratory Judgment

☐ 17 Merit Personnel Act (OEA)
   (D.C. Code Title 1, Chapter 6)
☐ 18 Product Liability

☐ 24 Application to Confirm, Modify,
   Vacate Arbitration Award (DC Code § 16-4401)
☐ 29 Merit Personnel Act (OHR)
☐ 31 Housing Code Regulations
☐ 32 Qui Tam
☐ 33 Whistleblower

**C.**

☐ 03 Change of Name
☐ 06 Foreign Judgment/Domestic
☐ 08 Foreign Judgment/International
☐ 13 Correction of Birth Certificate
☐ 14 Correction of Marriage
   Certificate
☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
☐ 27 Petition for Civil Asset Forfeiture (Currency)
☐ 28 Petition for Civil Asset Forfeiture (Other)

☐ 15 Libel of Information
☐ 19 Enter Administrative Order as
   Judgment [ D.C. Code §
   2-1802.03 (h) or 32-151 9 (a)]
☐ 20 Master Meter (D.C. Code §
   42-3301, et seq.)

☐ 21 Petition for Subpoena
   [Rule 28-I (b)]
☐ 22 Release Mechanics Lien
☐ 23 Rule 27(a)(1)
   (Perpetuate Testimony)
☐ 24 Petition for Structured Settlement
☐ 25 Petition for Liquidation

## D. REAL PROPERTY

☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 04 Condemnation (Eminent Domain)
☐ 10 Mortgage Foreclosure/Judicial Sale
☐ 11 Petition for Civil Asset Forfeiture (RP)

☐ 08 Quiet Title
☐ 25 Liens: Tax / Water Consent Granted
☐ 30 Liens: Tax / Water Consent Denied
☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

June 16, 2020
_____
Date

CV-496/ June 2015

Doc ID: 30e0467b125c451ff3e44acbc2c03aa3b65d017d

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

IBRAHEEM SAMIRAH DDS
    Vs.                            C.A. No.     2020 CA 002808 B
DISTRICT SMILES, PLLC et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                          Chief Judge Robert E. Morin

Case Assigned to: Judge KELLY A HIGASHI
Date:  June 17, 2020
Initial Conference: 9:30 am, Friday, September 25, 2020
Location:  Courtroom JM-4
             500 Indiana Avenue N.W.
             WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief    Judge    Robert    E.    Morin

D.C. Superior Court
09/18/2020 15:05PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION—CIVIL ACTIONS BRANCH

| | | |
|---|---|---|
| IBRAHEEM SAMIRAH, DDS, | * | |
| | * | |
| **Plaintiff,** | * | Civil Case No. 2020 CA 002808 B |
| | * | Civil II, Calendar I |
| v. | * | Judge Kelly A. Higashi |
| | * | |
| DISTRICT SMILES, PLLC, et al., | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

### ORDER SUA SPONTE RESCHEDULING INITIAL SCHEDULING CONFERENCE

An Initial Scheduling Conference for this matter is set for September 25, 2020, to determine scheduling matters related to this case. The Plaintiff filed the complaint on June 16, 2020. Currently, no proof or affidavit of service has been filed as to any Defendant. Typically, a party has 60 days to file proof of service or an affidavit of service with the court after filing the complaint. *See* Super. Ct. Civ. R. 4(l)(3)(m). The Plaintiff's time to file proof or affidavit of service, however, has been tolled by the Chief Judge's March 18, 2020 Order tolling deadlines due to COVID-19, with the tolling period lifted under certain circumstances on May 15, 2020.[1] Thus, it would be premature to hold an Initial Scheduling Conference at this time. In addition, in light of the ongoing situation related to COVID-19, the Initial Scheduling Conference will be vacated and rescheduled. Accordingly, it is this **18th** day of **September, 2020**, hereby

**ORDERED** that the Initial Scheduling Conference set for September 25, 2020 is **VACATED**; and it is further

---

[1] The March 18, May 14, June 19, and August 13, 2020 Order and all other Orders issued by the Chief Judge pursuant to the COVID-19 emergency can be accessed on the Court's website: https://www.dccourts.gov/coronavirus

**ORDERED** that the Parties shall appear for an Initial Scheduling Conference on

November 20, 2020 at 9:30 AM in Courtroom JM-4.[2] In order to facilitate the Court's timely

dissemination of its Orders and information about connecting to remote court hearings, all parties

who represent themselves[3] and who do not have an e-filing account with CaseFileXpress are

encouraged to watch the video referenced below[4] regarding how to open a free account with

CaseFileXpress, and are also requested to email the Court's chambers with the party's cell phone

number and email address, to JudgeHigashiChambers@dcsc.gov.

**Kelly A. Higashi**
Associate Judge
(Signed in Chambers)

**COPIES TO:**
Leizer Z. Goldsmith
*Via CaseFileXpress*

Dr. Maryam Seifi
9216 Quintana Drive
Bethesda, MD 20817

William Powell
9216 Quintana Drive
Bethesda, MD 20817

---

[2] The hearing may be held remotely due to the ongoing public health emergency. In that event, during the week before the hearing, the Court will provide the parties with detailed instructions on how to connect to the remote hearing.

[3] For all parties who are natural persons, the D.C. Superior Court has compiled information to help individuals find legal help for free and how to contact these legal resources during the pandemic on its website, found here: http://www.dccourts.gov/services/civil-matters/requesting-over-10k. If a natural person chooses to represent themselves, please review the D.C. Court's handbook titled, "Handbook for People Who Represent Themselves in Civil Cases," located here: http://www.dccourts.gov/sites/default/files/matters-docs/Handbook%20Revised%20Final_9%2021%2018.pdf.

[4] https://www.fileandservexpress.com/dc/#DCTraining

2

Nina Kimmel
9216 Quintana Drive
Bethesda, MD 20817

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

**ORDER**

**(Amended 3/18/20)**

By order issued on March 18, 2020, the Joint Committee of Judicial Administration authorized the Chief Judge to issue orders extending the period during which deadlines are tolled or extended for all statutory and rules-based time limits in the D.C. Code, and the Superior Court Rules, during the current judicial emergency and consistent with the best interest of the administration of justice.

By Order of the Chief Judge, the District of Columbia Superior Court is adjusting its operations to address concerns regarding the Coronavirus (COVID19). The court will make additional adjustments as circumstances warrant.

To the extent that a case type has not been identified below, all non-priority matters scheduled before May 15, 2020, will be rescheduled and new dates set; emergency matters will be heard as scheduled by the court and as set forth below.

It is ordered that no attorney or persons should enter the courthouse with symptoms of C0V19.
See https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html

Any party may seek relief from these changes by filing a motion with the appropriate court.

**Filings:**

All Divisions and the Family Court will be open for filing of pleadings, motions and new cases with limited staff.  Electronic filing will continue.

The following procedures are in effect through May 15, 2020:

**Tolling and Extending Filing Deadlines:**

Unless otherwise ordered by the court, all deadlines and time limits in statutes, court rules, and standing orders that would otherwise expire before May 15, 2020 including statutes of limitations, are tolled during the period of the current emergency.  Such deadlines and time limits may be further extended or modified as circumstances change.

**Court Operations:**

The court will hear only the following matters:

- Felony presentments and misdemeanor arraignments other than citation arraignments;

- Juvenile initial hearings and petitions for writ of habeas corpus;

- Initial hearings and requests of removal in neglect and abuse matters; and

- Emergency matters only.

The following courtrooms will hear matters:

- C-10: Criminal Arraignments and Presentments

- JM-15: Family Court Emergencies, Neglect Initial Hearings, and Juvenile Initial Hearings

- 115: Criminal Division and Domestic Violence Emergencies - other than TPOs emergencies which will be heard via Web Ex, see below

- 516: Civil and Probate and Tax Division Emergencies (Judge in Chambers)

All other matters are continued, parties need not appear and the court will notify parties of new date.

2

**Additional Matters**:

- All jury trials in progress shall proceed as scheduled.

- The court will still rule on motions and matters that can be decided without a hearing in all Divisions.

- Parties may file, and the court will rule on, applications for waivers of filing fees and other costs.

- The court will accept court-ordered payments by individuals; only payments for criminal matters, except bond payments, can be made electronically. In addition, any obligation of any tenant under a protective order to make payments into the court registry is suspended during the period of the emergency.  Tenants should make these payments instead directly to landlords, and a landlord's acceptance of a direct payment will not prejudice the landlord's ability to prosecute the action.  If a landlord seeks sanctions for violation of a protective order after the public health emergency ends, the court will consider, in addition to other relevant circumstances, exigent circumstances relating to the public health emergency.

- All evictions of tenants and foreclosed homeowners on or before May 15, 2020 are stayed.

- Extradition matters shall proceed as scheduled.

- Indictments returned by the grand jury shall be received as presented; all matters concerning appearance before the grand jury will be considered as presented.

- Pretrial and Probation show cause hearings and motions to review bond or release conditions may proceed and be heard by the Criminal Division Emergency Judge where appropriate.

3

- Any existing Temporary Protection Order and Civil Protection Order will remain in effect and will be extended through May 15, 2020 or to the next assigned court date.

- Requests for Temporary Protection Orders will be available through the Emergency Temporary Protection Order (ETPO) Process.  During this emergency operating Court status, the ETPO process will be accessible at any time of the day for situations involving immediate danger.  If you are in immediate danger and call the police (911) or the DC Safe Critical Response Team (800) 407-5048, you will be routed to the ETPO process to determine if you qualify for an Emergency Temporary Protection Order.

- Emergency Filings in Civil Protection Order cases can be made through www.probono.net/dccourts.  You can complete and submit the forms electronically. Once you complete and submit the form, please contact the Clerk's Office to proceed with the filing by phone at (202) 879-0157 or by email at domesticviolencemanagement@dcsc.gov. You can also access the Domestic Violence Division forms on the DC Courts website at http://www.dccourts.gov/services/forms?title=&combine and, after completing the form, email it to domesticviolencemanagement@dcsc.gov.  If there is a form that is not available on the website, please email domesticviolencemanagement@dcsc.gov for further assistance.

- The Marriage Bureau will not be issuing marriage licenses at this time. Wedding ceremonies previously scheduled will not go forward.  If you wish to reschedule your ceremony, please contact the Marriage Bureau at (202) 879-1212.

4

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### ORDER

### (Amended 5/14/20)

By order issued on March 18, 2020, the Joint Committee of Judicial Administration authorized the Chief Judge to issue orders extending the period during which deadlines are suspended, tolled, and extended for all statutory and rules-based time limits in the D.C. Code, and the Superior Court Rules, during the current judicial emergency and consistent with the best interest of the administration of justice.

By order issued March 18, 2020 and amended March 19, 2020, the Chief Judge ordered that all deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire before May 15, 2020 including statutes of limitations, are suspended, tolled, and extended during the period of the current emergency. As indicated in that order, the deadlines and time limits may be further suspended, tolled, and extended as circumstances change.

The Court is expanding the types and number of cases it will hear through June 19, 2020.

To ensure the safety and well-being of Court staff, counsel, parties and members of the public all case types will be heard remotely, except for the adult arraignment court.

To the extent that a case type has not been identified below, all non-priority matters scheduled through June 19, 2020, will be rescheduled and new dates set; emergency matters will be heard as scheduled by the court and as set forth below. Presiding Judges will issue additional orders, as necessary, setting forth the matters to be heard.

No attorney or persons should enter the courthouse with symptoms of C0VID-19.
See https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html

1

Any party may seek relief from these changes by filing a motion with the appropriate court.

All Divisions and the Family Court will be open in a remote status for filing of pleadings, motions, and new cases.  Electronic filing will continue.  See the Clerk's Offices Remote Operations Notices for detailed information.
http://www.dccourts.gov/coronavirus

When allowed by law, upon request members of the public may have real-time access to remote hearings by contacting the Clerk of the Court's Office which will provide information about the process of listening to live remote proceedings.

The Court will make additional adjustments as circumstances warrant.

The Court will operate primarily remotely under the following conditions:

## CIVIL DIVISION

Unless otherwise ordered by the court, all deadlines and time limits in statutes (including statute of limitations), court rules, and standing and other orders issued by the court that would otherwise expire during the period of emergency are suspended, tolled and extended during the period of emergency, except in any Civil 1 or 2 case subject to Rule 12-I of the Superior Court Rules of Civil Procedure, any suspension, tolling, or extension of the time to file any response or reply concerning a motion ends on May 15, 2020 with respect to all counsel who registered for E-filing before March 18, 2020.

The Civil Division will operate as follows:

- Both judges and division staff continue to work remotely.  Judges will conduct telephonic hearings on emergency and urgent matters five days per week in three virtual courtrooms

- Any emergency motion must be electronically filed and emailed to Civilefilings@dcsc.gov.

2

- Until further order, the Division will not conduct trials, jury or non-jury.

- Depending on the availability of counsel and parties, the Civil Division will use additional virtual courtrooms to conduct telephonic hearings in additional types of cases, including Civil 1 and 2.

- All evictions, foreclosure proceedings, and debt collection proceedings are stayed to the extent required by statute.

- Any obligation of any tenant under a protective order to make payments into the court registry is suspended until the period of the judicial emergency ends or until the Office of the Clerk can accept payments, whichever comes first. Tenants should make these payments instead directly to landlords, and a landlord's acceptance of a direct payment will not prejudice the landlord's ability to prosecute the action. If a landlord seeks sanctions for violation of a protective order after the judicial emergency ends, the court will consider, in addition to other relevant circumstances, exigent circumstances relating to the public health emergency.

## **CRIMINAL DIVISION**

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.  This would include, but is not limited to, timelines for preliminary hearings pursuant to Rules 5.1 and D.C Code § 23-1322(a) and (b), as well as to indictment deadlines and trial deadlines, including deadlines pursuant to D.C. Code §§ 23-102, 23-1322(h), and 24-801.

The following previously issued orders are extended until further order of the Court:

- March 16, 2020 Order giving law enforcement discretion to release additional individuals on citation.

3

- March 21, 2020 Order authorizing law enforcement to give citation release in lieu of arrest to individuals arrested on a limited category of misdemeanor bench warrants.
- March 27, 2020 Order suspending weekend jail sentences.
- April 1, 2020 Order clarifying the status of expiration dates for Deferred Prosecution and Sentencing Agreements and probationary terms.

The Criminal Division will operate as follows:

- The Criminal Division will continue to operate remotely with hearings being conducted via telephone or videoconference from the Central Cellblock, the D.C. Jail, St. Elizabeths Hospital and the community, except for Courtroom C10.

- For non-evidentiary matters, attorneys and defendants will appear via telephone or videoconference, with the consent of the defendant.

- Until further order, the Criminal Division will not be conducting non-jury or jury trials.

- Detained preliminary hearings and sentencings may proceed upon the request of defense counsel and agreement of the United States Attorney's Office or Office of the Attorney General, which agreement shall not be unreasonably withheld; witnesses and victims will also appear remotely.

- Six courtrooms will be operational remotely and primarily dedicated to the following functions:

  - C-10- arraignments, presentments, bench warrant returns, extradition, pretrial and probation show cause hearings.

  - 115- emergency bond review motions, fugitive and arrest warrants.

  - 317- mental observation and contested competency hearings.

  - 210- detained preliminary hearings.

4

- o 213- detained substantive non-evidentiary matters, including dispositions, waivers of preliminary hearings, sentencings, etc.

- o 111- non-detained substantive non-evidentiary matters, including entry or completion of Deferred Prosecution or Sentencing Agreements, dispositions and sentencings.

- Judges will have the ability to schedule hearings, not to exceed one day in length, on a case-by-case basis, subject to capacity.

- All status hearings, (except detained status hearings set out of C-10), trials, (both jury and non-jury, detained and non-detained), and non-detained preliminary hearings scheduled prior to June 19, 2020 will be continued to a future status date, at which time a new date for trial may be set.  Probation Show Cause hearings will be continued to a future date; the filing of an AVR shall toll the expiration of probation.  Sentencing hearings will also be continued to a future sentencing date, unless the parties request that the hearing proceed forward on an earlier date and all parties can appear remotely.

## **DOMESTIC VIOLENCE DIVISION**

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Domestic Violence Division will operate as follows:

- The Domestic Violence Division Clerk's Office will be available remotely from 8:30AM to 5PM Monday through Friday.

- All judges and courtroom staff will continue to work remotely.  Parties will appear via telephone or videoconference for hearings held in DVD remote courtrooms.

5

- Parties in DVM and CCC cases should continue to file electronically via CaseFileXpress. Civil filings can be submitted through www.probono.net/dccourts  or emailed to DomesticViolenceManagement@dcsc.gov.

Criminal Cases – Domestic Violence Misdemeanor (DVM) and Criminal Contempt (CCC)

- Until further order, the Domestic Violence Division will not be conducting non-jury trials

- All DVM arraignments will continue to be heard in Courtroom C10. CCC arraignments scheduled through June 19, 2020 will be continued.

- All other DVM hearings, including but not limited to status hearings, diversion matters, show cause hearings, trials, and sentencings, scheduled through June 19, 2020 will be continued consistent with a scheduling order issued by the presiding judge.

- Hearings in which a defendant is detained in the DVM or CCC case, including arraignments, emergency bond review motions, status hearings, and probation show cause hearings, at the request of the defendant and with the agreement of the government will be heard in a remote DVD courtroom.

- Judges will have the ability to schedule hearings on a case-by-case basis, subject to capacity.

Civil Protection Order Cases (CPOs)

- Requests for Temporary Protection Orders will continue to be heard remotely.

6

- All existing TPO expiration dates shall be extended to the future date consistent with a scheduling order issued by the presiding judge.

- All existing CPO expiration dates shall be extended to June 19 unless otherwise ordered by the court. All existing CPOs that would have expired prior to June 19, 2020, will expire on that date unless a Motion to Extend is filed prior to June 19, 2020.

- CPO hearings and related-CPO hearings will be continued to a future date consistent with a scheduling order issued by the presiding judge.

## Extreme Risk Protect Orders (ERPOs)

- Requests for Ex Parte and Final ERPOS are available and can be made by emailing the filing to DomesticViolenceManagement@dcsc.gov. The petition can be obtained from the DC Courts website. The assigned judge will hear the matter via WebEx videoconference.


**FAMILY COURT**

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court, except:

Abuse and Neglect Cases: Counsel and parties are expected to comply with applicable procedural rules including the filing of motions and oppositions unless otherwise directed by the assigned judge.  Adoption petitions may not yet be filed remotely, but all other pleadings in adoption matters may be filed remotely via E-Filing/CaseFileXpress.

Domestic Relations Cases: Counsel and parties are expected to comply with applicable procedural rules including the filing of motions and oppositions unless otherwise directed by the assigned judge. All deadlines in orders issued on or after March 20, 2020 stand.  All deadlines in orders issued before March 20, 2020 are extended by 90 days.

Because individuals are likely unable to comply with social distancing and "diligent efforts" to serve (either personally or by going to the post office to obtain a certified mail), electronic service via text message or email is permissible in accordance with Rule 4(c)(3)(B) without further order of the Court. The serving party must prove service to the satisfaction of the assigned judge, including showing that the electronic method of service was "reasonably calculated to give actual notice." Parties cannot serve electronically under Rule 4(c)(3)(B) if personal service is required by statute, including D.C. Code §§ 13-332 (requiring personal service on minors), 13-333 (requiring personal service on incompetent persons), and 46-206 (requiring personal service of the notice in cases involving support).

Mental Habilitation Cases: Counsel for Respondents shall continue to file Updated Status Reports pursuant to Administrative Order No 00-06, and to the extent possible, shall file Respondents Reports on Informed Consent for Voluntary Commitment and Substitute Decision Maker Reports. Parties shall comply with any existing order to file a special report or specific document. Parties shall comply with any existing order (a) requiring participants to convene meetings or (b) requiring the Department of Disability Services to provide specific services or supports to the extent possible, in light of the pandemic.

The Family Court is conducting the following types of remote hearings:

Abuse and Neglect:

- Neglect initial hearings
- Emergency hearings
- Disposition hearings
- Any hearings where the parties consent to the outcome
- Pretrial and status hearings where necessary
- Stipulated trials, one day trials of any type, including *Ta. L.* hearings and adoption and guardianship trials lasting one day or less.

Domestic Relations:

8

- Divorces, separations, custody, child support where the parties represent the case is uncontested or has been settled.
- Domestic relations same day emergency hearings.
- Emergency motions to modify custody or for contempt where same day emergency hearing was denied but the Court concludes that it is both necessary and feasible to hear the motion on an expedited basis.
- Discretionary matters, such as resolving discovery issues or other issues, either capable of resolution during a remote hearing, or deemed necessary in the interest of justice.

Juvenile Delinquency, Persons in Need of Supervision, and Private Adoptions:

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled, and extended during the period pending further order of the Court.  Notwithstanding this Order, the Family Court will hold the following hearings:

- Juvenile initial hearings, including probable cause hearings.
- Any other hearings (e.g. emergency hearings, status hearings, disposition hearings) based upon the judge's determination that holding a hearing would be beneficial toward resolving the case or will result in a change in the level of detention of a juvenile; this applies to HOPE and Juvenile Behavioral Diversion Program (JPDP) courts.
- Trials of detained juveniles, when possible, if parties agree to remote proceedings.
- Private adoptions, when possible.

Mental Health:

- Mental health probable cause hearings.
- Mental Health Commission hearings.
- Revocation hearings, status hearings where needed, emergency hearings, and trials where feasible and all parties can appear via WebEx.

Mental Habilitation:

- Mental habilitation review and emergency hearings when all parties can access the court via WebEx.

Name Changes:

- Uncontested requests, when known.
- Emergency requests.

Parentage and Support Cases:

- Cases where needed and resolving those on paper where possible.
- DNA testing is currently unavailable.

Marriages:

- Marriages have resumed and are being conducted via WebEx.  Parties who wish to apply for a marriage license, please visit: https://www.dccourts.gov/form/marriage-application

Other Relevant Information:

- The process for filing new domestic relations complaints or petitions in Family Court is laid out in detail on the Court's website, see: https://www.dccourts.gov/sites/default/files/DRB-Case-Initiation-Instructions-for-filers.pdf.

- The Self-Help Center (202-879-0096) is operating on a remote basis to provide information and to assist parties in filing documents in Family Court cases (divorce, child custody, child support, etc.).

- The Court will issue summonses electronically and will email them to the filer.

- Domestic Relations Initial Hearings will not be scheduled at the time of filing; they will be scheduled once a responsive pleading is filed or an

10

affidavit of service is filed and as is feasible given the status of court operations.

- The Supervised Visitation Center is conducting intake interviews and supervised visits remotely.

- Multi-door mediation and intake for mediation is available for parties able to participate in remote mediation either through video-conferencing or telephonically.


**PROBATE AND TAX DIVISION**

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Probate and Tax Division will operate as follows:

- Judges will hear the following matters remotely by WebEx:

- 21-Day Emergency Guardians—Filed by email (attorneys and self-represented filers) and by Telephone (self-represented filers only)

- 90-Day Health-Care Guardians—Filed by email (attorneys and self-represented filers) and by Telephone (self-represented filers only)

- Petitions for General Proceedings (Guardianship and Conservatorship petitions)—Filed by email (attorneys and self-represented filers); and by mail (attorneys and self-represented filers)

- Petitions for General Proceedings will be handled in the following order:

  - Group I – Judges will reschedule matters that were previously set to be heard between March 19, 2020 through May 15, 2020.

      o  Group II – Judges will schedule hearings on petitions mailed or filed between March 19, 2020 and May 15, 2020.

- Process for conducting hearings on Petitions for General Proceedings:
  - o  Probate Judges will have access remotely to two courtrooms.
  - o  The Judge's Order of Appointment will include the date and time of the hearing, and WebEx instructions will be provided to parties and interested persons.
  - o  Parties should email a proposed order and Firearms Restriction Form to the Judge's Chambers' inbox or the Judge's law clerk.
  - o  Fixed Fee Vouchers are not available for remote hearings.

## OFFICE OF THE AUDITOR MASTER

All hearings in the Auditor Master Office are currently cancelled and parties are not to appear.  All orders that have been issued directing parties to produce documents are continued.  All staff are working remotely.

The Office will issue separate orders that will reschedule all previously scheduled hearings, schedule hearings in new matters, and set new dates for production of documents.

Parties can reach the Office by emailing Auditor.Master@dcsc.gov or calling 202-626-3280.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

**ORDER**

**(Amended 6/19/20)**

By Order issued on March 18, 2020, and reaffirmed on May 29, 2020, the Joint Committee of Judicial Administration authorized the Chief Judge to issue orders extending the period during which deadlines are suspended, tolled, and extended for all statutory and rules-based time limits in the D.C. Code, and the Superior Court Rules, during the current judicial emergency and consistent with the best interest of the administration of justice.

By Orders issued March 18, 2020, March 19, 2020, and most recently May 14, 2020, the Chief Judge ordered that (except as otherwise specified) all deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire before June 19, 2020 including statutes of limitations, are suspended, tolled, and extended during the period of the current emergency. As indicated in that order, the deadlines and time limits may be further suspended, tolled, and extended as circumstances change.

The Court is expanding the types and number of cases it will hear through August 14, 2020.

To ensure the safety and well-being of Court staff, counsel, parties, and members of the public, all case types will be heard remotely, except for a limited number of Criminal Division hearings, which will be partially remote.

To the extent that a case type has not been identified below, all nonpriority matters scheduled through August 14, 2020, will be rescheduled and new dates set; emergency matters will be heard as scheduled by the court and as set forth below. Presiding Judges will issue additional orders, as necessary, setting forth the matters to be heard.

1

No attorney or persons should enter the courthouse with symptoms of COVID-19.
See https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html

Any party may seek relief from these changes by filing a motion with the appropriate division.

All Divisions and the Family Court will be open in a remote status for filing of pleadings, motions, and new cases.  Electronic filing will continue. See the Clerk's Offices Remote Operations Notices for detailed information. http://www.dccourts.gov/coronavirus

The Court is now accepting electronic payments in certain circumstances. For more specific information, see https://www.dccourts.gov/services/online-payment.

When permitted by law, and upon request, members of the public may have real-time access to remote hearings by contacting the Clerk of the Court's Office, which will provide information about the process of listening to live remote proceedings.

The Court will make additional adjustments as circumstances warrant. Currently, the Court is operating 24 courtrooms remotely.  The Court anticipates that it will have 37 courtrooms available for remote hearings by the end of June 2020 and 57 courtrooms available by the end of July 2020.  As additional courtrooms are made available, the Presiding Judges for each Division are authorized to announce other matters that may be scheduled and heard.

The Court will operate primarily remotely under the following conditions:

2

## CIVIL DIVISION

Unless otherwise ordered by the court, all deadlines and time limits in statutes (including statute of limitations), court rules, and standing and other orders issued by the court that would otherwise expire during the period of emergency are suspended, tolled and extended during the period of emergency, except that in any Civil 1 or 2 case subject to Rule 12-I of the Superior Court Rules of Civil Procedure, any L&T case or Small Claims case certified to the Civil Actions Branch, and any mortgage or tax sale foreclosure case, any suspension, tolling, or extension of the time to file any response or reply concerning a motion ends on May 15, 2020 with respect to all counsel who registered for E-filing before March 18, 2020.

The Civil Division will operate as follows:

- Both judges and division staff continue to work remotely.  Judges will conduct telephonic hearings on emergency and urgent matters five days per week in virtual courtrooms

- Any emergency motion must be electronically filed and emailed to Civilefilings@dcsc.gov.

- Until further order, the Civil Division will not conduct in-court trials, jury or non-jury.  When the Civil Division resumes scheduling of in-court trials, it will either schedule the trial during a hearing with all parties present or issue written notice 30 days before any in-court, non-jury trial and 60 days before any jury trial to provide the counsel and parties time to subpoena witnesses and prepare for trial.  The Civil Division may conduct remote non-jury trials with appropriate notice to the parties.

- The Civil Division will conduct remote hearings, including evidentiary hearings and bench trials, in any case where it is appropriate.

3

- All evictions, foreclosure proceedings, and debt collection proceedings are stayed to the extent required by statute.

- The Civil Division may conduct remote hearings or rule on ripe motions in eviction, foreclosure, and debt collection cases that are not stayed. These matters include Small Claims matters that are not subject to the General Order Regarding Debt Collection Cases issued on May 7, 2020 or the statutory moratorium for debt collection cases and Landlord and Tenant matters that do not involve non-payment of rent or are otherwise not subject to the statutory moratorium, and such other motion hearings or short evidentiary hearings as may be appropriate including hearings on service of process, *ex parte* proof, and protective orders.

- Any tenant obligated under a protective order to make a payment into the court registry shall make the payment directly to the landlord, except that if the total monthly payment does not exceed $1,000, the tenant may make the payment to the Court on the electronic payment portal. Please see the Notice of the Clerk's Offices Operations for instructions. https://www.dccourts.gov/sites/default/files/Superior-Court-Clerks-Offices-Remote-Operations.pdf. A landlord's acceptance of a direct payment will not prejudice the landlord's ability to prosecute the action. If a landlord seeks sanctions for violation of a protective order after the judicial emergency ends, the court will consider, in addition to other relevant circumstances, exigent circumstances relating to the public health emergency.

- Notwithstanding anything in Administrative Order 06-17 affidavits of service may be filed electronically during the period of the emergency.

- Notwithstanding anything in Administrative Order 15-03, applications to amend vital records, including name changes, may be filed electronically during the period of the emergency once configured with CaseFileXpress.

4

**CRIMINAL DIVISION**

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.  This includes, but is not limited to, timelines for preliminary hearings pursuant to Rules 5.1 and D.C Code § 23-1322(a) and (b), as well as indictment deadlines and trial deadlines, including deadlines pursuant to D.C. Code §§ 23-102, 23-1322(h), and 24-801.

The following previously issued orders are extended until further order of the Court:

- March 16, 2020 Order giving law enforcement discretion to release additional individuals on citation.
- March 21, 2020 Order authorizing law enforcement to give citation release in lieu of arrest to individuals arrested on a limited category of misdemeanor bench warrants.
- March 27, 2020 Order suspending weekend jail sentences.
- April 1, 2020 Order clarifying the status of expiration dates for Deferred Prosecution and Sentencing Agreements and probationary terms.

The Criminal Division will operate as follows:

- The Criminal Division will continue to operate remotely or partially remotely with hearings being conducted via telephone or videoconference from the Central Cellblock, the D.C. Jail, St. Elizabeths Hospital and the community.

- Detained preliminary hearings and other non-evidentiary hearings may proceed upon the request of defense counsel and agreement of the United States Attorney's Office or Office of the Attorney General,

5

which agreement shall not be unreasonably withheld; witnesses and victims will also appear remotely.

- Nine courtrooms will operate remotely or partially remotely and primarily dedicated to the following functions:

  - ○ C-10 – arraignments, presentments, bench warrant returns, extraditions.

  - ○ 115 – remote substantive non-evidentiary matters, including emergency bond review motions in detained cases.

  - ○ 317 – remote mental observation and contested competency hearings.

  - ○ 210 – remote detained preliminary hearings.

  - ○ 211 and 215 – partially remote detained preliminary hearings with defendants appearing before the judge in the courtroom subject to an approved COVID-19 protocol.

  - ○ 213 – remote detained substantive non-evidentiary matters, including dispositions, waivers of preliminary hearings, sentencings, etc.

  - ○ 111 – remote non-detained matters, including entry or completion of Deferred Prosecution or Sentencing Agreements, dispositions and sentencings.

  - ○ 112 –partially remote non-detained matters with defendants appearing before the judge in the courtroom subject to an approved COVID-19 protocol, pretrial and probation show cause hearings, and walk-in bench warrants.

- ○ Counsel, pre-trial services representatives and probation officers, witnesses and victims may appear in person or continue to appear remotely via video or teleconference.

- All status hearings, (except detained status hearings set out of C-10), trials, (both jury and non-jury, detained and non-detained), and non-detained preliminary hearings scheduled through August 14, 2020 will be continued to a future status date, at which time a new date for trial may be set.  Probation show cause hearings will be continued to a future date; the filing of an AVR shall toll the expiration of probation. Sentencing hearings will also be continued to a future sentencing date, unless the parties request that the hearing proceed forward on an earlier date and all parties can appear remotely.

- Until further notice the Criminal Division will not be conducting non-jury or jury trials.  The Criminal Division will issue written notice 30 days prior to the recommencement of non-jury trials and 60 days prior to the recommencement of jury trials to provide the prosecution and defense sufficient time to subpoena witnesses and prepare for trial.


## DOMESTIC VIOLENCE DIVISION

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Domestic Violence Division will operate as follows:

- The Domestic Violence Division Clerk's Office will be available remotely from 8:30AM to 5PM Monday through Friday.

7

- All judges and courtroom staff will continue to work remotely.  Parties may continue to appear via telephone or videoconference for hearings held in DVD remote courtrooms.

- Parties in DVM and CCC cases should continue to file electronically via CaseFileXpress.  Civil filings can be submitted through www.probono.net/dccourts or emailed to DomesticViolenceManagement@dcsc.gov.

Criminal Cases – Domestic Violence Misdemeanor (DVM) and Criminal Contempt (CCC)

- Until further notice, the Domestic Violence Division will not be conducting non-jury trials. The DVD will issue written notice 30 days prior to the recommencement of non-jury trials to provide the parties and counsel sufficient time to subpoena witnesses and prepare for trial.

- All DVM arraignments will continue to be heard in Courtroom C10. CCC arraignments scheduled through August 14, 2020 will be continued consistent with a scheduling order issued by the presiding judge.

- Detention hearings and other non-evidentiary hearings in which a defendant is detained in the DVM or CCC case will be scheduled through the Presiding Judge's chambers.  Witnesses will appear remotely.  All matters will be heard in remote Courtroom 118.

- Probation show cause hearings will be continued to a future date; the filing of an AVR shall toll the expiration of probation.  Some expedited probation show cause hearings will be held in a partially remote courtroom, to be announced at a later date.

8

- All other DVM and CCC hearings, including status hearings, diversion matters, trials, and sentencings, scheduled through August 14, 2020, will be continued consistent with a scheduling order issued by the presiding judge.

- Judges will have the ability to schedule hearings on a case-by-case basis, subject to capacity.

Civil Protection Order Cases (CPOs)

- Requests for Temporary Protection Orders will continue to be heard remotely in remote courtrooms 117 and 114.

- All existing TPO expiration dates shall be extended to the future date consistent with a scheduling order issued by the presiding judge.

- All existing CPOs expire either on the expiration date of the order or on June 19, 2020 whichever is the latter of the two dates, unless a Motion to Extend is filed.  Note that the expiration of existing CPO cases differs from the DV Division's approach in the previous COVID-19 Orders issued on March 19, 2020 and May 14, 2020.

- CPO hearings and related-CPO hearings will be continued to a future date consistent with a scheduling order issued by the presiding judge. Upon request of the parties, hearings, such as consent civil protection order cases facilitated through the attorney negotiation process, will be adjudicated in a DVD remote courtroom to be assigned at a later date.

Extreme Risk Protect Orders (ERPOs)

- Requests for Ex Parte and Final ERPOS are available and can be made by emailing the filing to DomesticViolenceManagement@dcsc.gov.

9

The petition can be obtained from the DC Courts website. The assigned judge will hear the matter via WebEx videoconference.

## FAMILY COURT

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court, except:

Abuse and Neglect Cases: Counsel and parties are expected to comply with applicable procedural rules including the filing of motions and oppositions unless otherwise directed by the assigned judge. The time for filing discovery requests and responses is not automatically stayed pending the COVID-19 emergency. Counsel and parties are expected to comply with applicable procedural rules unless otherwise directed by the assigned judge. Adoption petitions may be filed electronically, via digital drop box at https://dcscgov.app.box.com/f/aeaf4eb2153743519a495d3f95d26c93. All other pleadings in adoption matters may be filed remotely via E-Filing/CaseFileXpress.

Domestic Relations Cases: Counsel and parties are expected to comply with applicable procedural rules including the filing of motions and oppositions unless otherwise directed by the assigned judge. All deadlines in orders issued on or after March 20, 2020 stand. All deadlines in orders issued before March 20, 2020 are extended by 90 additional days.

Because individuals are likely unable to comply with social distancing and "diligent efforts" to serve (either personally or by going to the post office to obtain a certified mail), electronic service via text message or email is permissible in accordance with Rule 4(c)(3)(B) without further

10

order of the Court.  The serving party must prove service to the satisfaction of the assigned judge, including showing that the electronic method of service was "reasonably calculated to give actual notice." Parties cannot serve electronically under Rule 4(c)(3)(B) if personal service is required by statute, including D.C. Code §§ 13-332 (requiring personal service on minors), 13-333 (requiring personal service on incompetent persons), and 46-206 (requiring personal service of the notice in cases involving support).

Mental Habilitation Cases:  Counsel for Respondents shall continue to file Updated Status Reports pursuant to Administrative Order No 00-06, and to the extent possible, shall file Respondents Reports on Informed Consent for Voluntary Commitment and Substitute Decision Maker Reports.  Parties shall comply with any existing order to file a special report or specific document.  Parties shall comply with any existing order (a) requiring participants to convene meetings or (b) requiring the Department of Disability Services to provide specific services or supports to the extent possible, in light of the pandemic.

The Family Court is conducting the following types of remote hearings:

Abuse and Neglect:

- Neglect initial hearings
- Emergency hearings
- Disposition hearings
- Any hearings depending on courtroom availability
- Pretrial and status hearings where necessary
- Any trial, including *Ta. L.* hearings and adoption and guardianship trials depending on courtroom availability
- Family Treatment Court

11

Domestic Relations:

- Divorces, separations, custody, child support depending on courtroom availability and such other matters that the Court deems appropriate.
- Domestic relations same day emergency hearings.
- Emergency motions to modify custody or for contempt where same day emergency hearing was denied but the Court concludes that it is both necessary and feasible to hear the motion on an expedited basis.
- Discretionary matters, such as resolving discovery issues or other issues, either capable of resolution during a remote hearing, or deemed necessary in the interest of justice.

Juvenile Delinquency, Persons in Need of Supervision, and Private Adoptions:

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled, and extended during the period pending further order of the Court. Notwithstanding this Order, the Family Court will hold the following hearings:

- Juvenile initial hearings, including probable cause hearings.
- Any other hearings (e.g. emergency hearings, status hearings, disposition hearings) based upon the judge's determination that holding a hearing would be beneficial toward resolving the case or will result in a change in the level of detention of a juvenile; this applies to HOPE and Juvenile Behavioral Diversion Program (JPDP) courts.
- Factfinding hearings for juveniles, which will occur only remotely and only if, in a particular case, the Court finds for specific reasons that the factfinding hearing in that case cannot be further delayed without serious harm to the interests of justice, and only with the consent of the respondent after consultation with counsel. Either party may seek a continuance of a factfinding hearing for reasons of witness

12

unavailability, or any other reason, in accordance with the Superior Court Juvenile Rules.

- Special Immigrant Juvenile Status hearings.
- Private adoptions, when possible.

Mental Health:

- Mental health probable cause hearings.
- Mental Health Commission hearings.
- Revocation hearings, status hearings where needed, emergency hearings, pretrial hearings and trials where feasible and all parties can appear via WebEx.

Mental Habilitation:

- Mental habilitation review and emergency hearings when all parties can access the court via WebEx.

Name Changes:

- Uncontested requests, when known and contested requests deemed necessary in the interest of justice.
- Emergency requests.

Parentage and Support Cases:

- Cases where needed and resolving those on paper where possible.

Marriages:

- Marriages have resumed and are being conducted via WebEx.  Parties who wish to apply for a marriage license, please visit: https://www.dccourts.gov/form/marriage-application

13

Other Relevant Information:

- The process for filing new domestic relations complaints or petitions in Family Court is laid out in detail on the Court's website, see: https://www.dccourts.gov/sites/default/files/DRB-Case-InitiationInstructions-for-filers.pdf.

- The Family Court Self-Help Center (202-879-0096) is operating on a remote basis to provide information and to assist parties in filing documents in Family Court cases (divorce, child custody, child support, etc.).

- The Court will issue summonses electronically and will email them to the filer.

- Domestic Relations Initial Hearings will not be scheduled at the time of filing; they will be scheduled once a responsive pleading is filed or an affidavit of service is filed and as is feasible given the status of court operations.

- The Supervised Visitation Center is conducting intake interviews and supervised visits remotely.

- Multi-door mediation and intake for mediation is available for parties able to participate in remote mediation either through videoconferencing or telephonically.

## PROBATE DIVISION

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

14

The Probate Division will operate as follows:

- Judges will hear the following matters remotely by WebEx:

- 21-Day Emergency Guardians — Filed by email (attorneys and self-represented filers) and by Telephone (self-represented filers only)

- 90-Day Health-Care Guardians — Filed by email (attorneys and self-represented filers) and by Telephone (self-represented filers only)

- Petitions for General Proceedings (Guardianship and Conservatorship petitions) – Filed by email (attorneys and self-represented filers); and by mail (attorneys and self-represented filers)

- Other Intervention matters which the individual judge determines are appropriate to be heard remotely by WebEx

- Other Probate matters, including Estate cases, which the individual judge determines are appropriate to be heard remotely by WebEx

## TAX DIVISION

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Tax Division will operate as follows:

- Show Cause hearings will be heard remotely via WebEx
- Initial Scheduling and Pre-Trial Conferences will be held remotely by WebEx

## OFFICE OF THE AUDITOR MASTER

All Auditor-Master hearings are currently **cancelled** and parties are not to appear. All orders that have been issued directing parties to produce documents are continued. The Office will issue separate orders that will reschedule all previously scheduled hearings, schedule hearings in new matters, and set new dates for production of documents. Where possible hearings will be conducted remotely until the Court resumes onsite operations.

Be advised that staff is processing all documents remotely. Documents may be submitted via email to: Auditor.Master@dcsc.gov or mailed to: D.C. Superior Court, Office of the Auditor-Master, 500 Indiana Avenue NW, Washington, DC 20001.

Reports are currently being prepared for matters in which all hearings have been conducted and all documentation has been received. Reports will be served on parties when they are completed.

For questions, please contact the Office via telephone at 202-626-3280 or email at Auditor.Master@dcsc.gov.

16

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### ORDER

### (Amended 8/13/20)

By Order issued on March 18, 2020, and reaffirmed on May 29, 2020, the Joint Committee of Judicial Administration authorized the Chief Judge to issue orders extending the period during which deadlines are suspended, tolled, and extended for all statutory and rules-based time limits in the D.C. Code, and the Superior Court Rules, during the current judicial emergency and consistent with the best interest of the administration of justice.

By Orders issued March 18, 2020, March 19, 2020, May 14, 2020, and June 19, 2020 the Chief Judge ordered that (except as otherwise specified) all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire before June 19, 2020 including statutes of limitations, are suspended, tolled, and extended during the period of the current judicial emergency. As indicated in that order, the deadlines and time limits may be further suspended, tolled, and extended as circumstances change. Suspension, tolling, and extension will continue to the extent specified in this Order until at least November 9, 2020. The Court will provide at least 60 days' notice before ending all suspension, tolling, and extension of deadlines.

The Court is expanding the types and number of cases it will hear through November 9, 2020.

To ensure the safety and well-being of Court staff, counsel, parties, and members of the public, all case types will be heard remotely, except for a limited number of Criminal Division hearings, which will be partially remote.

To the extent that a case type has not been identified below, all nonpriority matters scheduled through November 9, 2020, will be rescheduled and new dates set; emergency matters will be heard as

1

scheduled by the Court and as set forth below.  Presiding Judges will issue additional orders, as necessary, setting forth the matters to be heard.

No attorney or persons should enter the courthouse with symptoms of COVID-19.
See https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html

Any party may seek relief from these changes by filing a motion with the appropriate division.

All Divisions and the Family Court will be open in a remote status for filing of pleadings, motions, and new cases.  Electronic filing will continue. See the Clerk's Offices Remote Operations Notices for detailed information. http://www.dccourts.gov/coronavirus

The Court is now accepting electronic payments in certain circumstances. For more specific information, see https://www.dccourts.gov/services/online-payment.

When permitted by law, members of the public may have real-time access to remote hearings.  Information about the process for listening to live remote proceedings are posted on the Court's website. https://www.dccourts.gov/services/remote-hearing-information

The Court will make additional adjustments as circumstances warrant. Most courtrooms can be used for remote operations, and the Court will equip the remaining courtrooms as soon as possible.  As additional courtrooms are made available, the Presiding Judges for each Division will announce other matters that may be scheduled and heard.

The Court will operate primarily remotely under the following conditions:

2

## CIVIL DIVISION

Unless otherwise ordered by the Court, all deadlines and time limits in statutes (including statute of limitations), court rules, and standing and other orders issued by the Court that would otherwise expire during the period of emergency are suspended, tolled and extended during the period of emergency, with the following exceptions: (1) deadlines applicable to parties represented by counsel in pending cases, except deadlines for service of process; (2) discovery-related deadlines applicable to all parties, including parties not represented by counsel; and (3) deadlines in scheduling orders issued after March 18, 2020.

The Civil Division will operate as follows:

- Both judges and division staff continue to work remotely. Judges will conduct remote hearings five days per week in virtual courtrooms. No parties or attorneys should appear in person unless specifically directed to do so by a judge.

- Any emergency motion must be electronically filed and emailed to Civilefilings@dcsc.gov.

- The Civil Division may conduct remote non-jury trials with appropriate notice to the parties. Until further order, the Civil Division will not conduct jury trials. When the Civil Division schedules in-court jury or non-jury trials, it will either schedule the trial during a hearing with all parties present or issue written notice 30 days before any in-court, non-jury trial and 60 days before any jury trial to provide counsel and parties time to subpoena witnesses and prepare for trial.

- The Civil Division will conduct remote hearings, including evidentiary hearings and bench trials, in any case where it is appropriate.

- All evictions, foreclosure proceedings, and debt collection proceedings are stayed to the extent required by statute.

3

- The Civil Division may conduct remote hearings or rule on ripe motions in eviction, foreclosure, and debt collection cases that are not stayed. These matters include Small Claims matters that are not subject to the General Order Regarding Debt Collection Cases issued on May 7, 2020 or the statutory moratorium for debt collection cases and Landlord and Tenant matters that are not subject to the statutory moratorium, and such other motion hearings or short evidentiary hearings as may be appropriate including hearings on service of process, *ex parte* proof, and protective orders.

- While the Court has limited ability to accept in-person payments required by a protective order, the tenant shall make a **non-cash** payment by one of the following methods: (1) mailing the payment to the Landlord and Tenant Clerk's Office, 510 4th Street NW, Room 110, Washington, DC 20001; (2) depositing the payment in the drop box in the lobby of the Moultrie Courthouse located at 500 Indiana Avenue, NW, Washington, DC 20001; (3) making the payment electronically through the court's portal, provided that the total monthly payment does not exceed $1,000. Please see the Notice of the Clerk's Offices Operations for instructions about electronic payments: https://www.dccourts.gov/sites/default/files/Superior-Court-Clerks-Offices-Remote-Operations.pdf. **Cash payments** can be accepted on a limited basis at the courthouse. Please see the Notice of the Clerk's Offices for more information about dates and times (click on the link above). A tenant may make a payment directly to the landlord, and a landlord's acceptance of a direct payment will not prejudice the landlord's ability to prosecute the action. If a tenant does not obtain a modification of a protective order and does not make a payment either into the Court registry or directly to a landlord during the emergency, and if a landlord then seeks sanctions, the Court will consider, in addition to other relevant circumstances, exigent circumstances relating to the public health emergency.

4

- Notwithstanding anything in Administrative Order 06-17 affidavits of service may be filed electronically during the period of the emergency.

- Notwithstanding anything in Administrative Order 15-03, applications to amend vital records, including name changes, and other matters heard by Judge in Chambers may be filed electronically during the period of the emergency once configured with CaseFileXpress.

- Notwithstanding anything in Rule 5 and 5-III, documents may be filed electronically in cases under seal which contain and SLD in the case number (e.g. 2020 CABSLD 000001) during the period of emergency. Sealed and unredacted documents in an otherwise unsealed case must continue to be submitted in paper to the clerk's office by mail or via the drop box.

- To facilitate remote hearings, the Civil Division encourages all parties to contact the Civil Division Clerk's Offices to provide contact information, including any telephone numbers and email addresses where parties can be reached.  Please call the number listed below to provide your contact information or that of any other parties.

| Civil Division | |
|---|---|
| - Civil Actions Branch | 202-879-1133 |
| - Landlord & Tenant Branch | 202-879-4879 |
| - Small Claims Branch | 202-879-1120 |

## **CRIMINAL DIVISION**

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court. This includes, but is not limited to, timelines for preliminary hearings pursuant to Rules 5.1 and D.C Code § 23-1322(a) and (b), as well as indictment deadlines and trial deadlines, including

5

deadlines pursuant to D.C. Code §§ 23-102, 23-1322(h), 24-801, and 24-531.01 et. seq.

The following previously issued orders are extended until further order of the Court:

- March 16, 2020 Order giving law enforcement discretion to release additional individuals on citation.
- March 21, 2020 Order authorizing law enforcement to give citation release in lieu of arrest to individuals arrested on a limited category of misdemeanor bench warrants.
- March 27, 2020 Order suspending weekend jail sentences.
- April 1, 2020 Order clarifying the status of expiration dates for Deferred Prosecution and Sentencing Agreements and probationary terms.

The Criminal Division will operate as follows:

- The Criminal Division will continue to operate remotely or partially remotely with hearings being conducted via telephone or videoconference from the Central Cellblock, the D.C. Jail, Saint Elizabeths Hospital, Department of Youth Rehabilitation Services, Bureau of Prisons, and the community.

- Detained preliminary hearings and other non-evidentiary hearings may proceed upon the request of defense counsel and agreement of the United States Attorney's Office or Office of the Attorney General, which agreement shall not be unreasonably withheld.

- Fifteen courtrooms will operate remotely or partially remotely and are primarily dedicated to the following functions:

Partially remote courtrooms:

- o C-10 – arraignments, presentments, bench warrant returns, extraditions.

- o 112 – partially remote non-detained matters with defendants appearing before the judge in the courtroom for non-evidentiary hearings to include pretrial and probation show cause hearings; walk-in bench warrants may report to this courtroom.

- o 203, 211, and 215 – partially remote detained CF1 and CF3 preliminary hearings with defendants appearing before the judge in the courtroom subject to an approved testing and screening COVID-19 protocol.

Remote courtrooms:

- o 111 – remote non-detained matters, including entry or completion of Deferred Prosecution or Sentencing Agreements, dispositions, and sentencings.

- o 115 – remote detained substantive non-evidentiary matters, including emergency bond review motions.

- o 210 – remote detained CF2 preliminary hearings.

- o 213 – AM remote detained substantive non-evidentiary matters, including dispositions, waivers of preliminary hearings, sentencings, etc.; PM detained initial scheduling conference, defendant's appearance waived.

- o 218 and 311 – remote detained matters from DYRS and BOP for substantive non-evidentiary matters, and non-detained matters before the case judge.

7

- 220 – remote non-emergency probation show cause hearings.

- 313 – remote non-detained matters prosecuted by the Office of the Attorney General, including entry or completion of Deferred Prosecution or Sentencing Agreements, dispositions, and sentencings.

- 314 – remote scheduling hearings in detained matters previously set for non-jury trial and continued; defendant's presence waived.

- 317 – remote mental observation and contested competency hearings from Saint Elizabeths Hospital.

Counsel, pre-trial services representatives and probation officers, witnesses and victims may appear in person or continue to appear remotely via video or teleconference.

Pretrial and probation show cause hearings scheduled in partially remote Courtroom 112 and remote Courtrooms 111, 115, 218, 220, and 311 shall not be continued.  All other probation show cause hearings will be continued to a future date; the filing of an AVR shall toll the expiration of probation.

Detained status hearings set out of C-10 in remote Courtroom 213 shall not be continued.  Detained status hearings in cases previously set for non-jury trial and continued due to COVID-19 shall be set for a remote scheduling hearing pursuant to separate Criminal Division order.  At or following the scheduling hearing, upon request of both parties, a non-jury trial may be set a minimum of 30 days in advance.

- All other status hearings, citation and felony arraignments, trials, (both jury and non-jury, detained and non-detained), and non-detained preliminary hearings scheduled through November 9, 2020 will be continued to a future status date.   Sentencing hearings will also be continued to a future sentencing date, unless the parties request that

8

the hearing proceed forward on an earlier date and all parties can appear remotely.

- Until further notice the Criminal Division will not be conducting non-jury or jury trials.  The Criminal Division will issue written notice 30 days prior to the recommencement of non-jury trials and 60 days prior to the recommencement of jury trials to provide the prosecution and defense sufficient time to subpoena witnesses and prepare for trial.

## **DOMESTIC VIOLENCE DIVISION**

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Domestic Violence Division will operate as follows:

- The Domestic Violence Division Clerk's Office will be available remotely from 8:30AM to 5PM Monday through Friday.

- All judges and courtroom staff will continue to work remotely.  Parties may continue to appear via telephone or videoconference for hearings held in DVD remote courtrooms, except when specifically ordered to appear in person in a partially remote courtroom.

- Parties in DVM and CCC cases should continue to file electronically via CaseFileXpress.  Civil filings can be submitted through www.probono.net/dccourts or emailed to DomesticViolenceManagement@dcsc.gov.

Criminal Cases – Domestic Violence Misdemeanor (DVM) and Criminal Contempt (CCC)

9

- Until further notice, the Domestic Violence Division will not be conducting non-jury trials. The DVD will issue written notice 30 days prior to the recommencement of non-jury trials to provide the parties and counsel sufficient time to subpoena witnesses and prepare for trial.

- All DVM arraignments will continue to be heard in Courtroom C-10. CCC arraignments scheduled through November 9, 2020 will be continued consistent with a scheduling order issued by the presiding judge.

- Detention hearings and other non-evidentiary hearings in which a defendant is detained in the DVM or CCC case will take place on Tuesdays and Thursdays. Witnesses will appear remotely. All matters will be heard in either remote Courtroom 118 or 119.

- Pretrial and probation show cause hearings scheduled in a partially remote courtroom shall not be continued. Defendants are to appear before the judge in person, subject to an approved COVID-19 protocol. All other parties may appear by phone or videoconference. All other probation show cause hearings will be continued to a future date; the filing of an AVR shall toll the expiration of probation.

- Detained status hearings set out of C-10 in a remote courtroom shall not be continued. The defendant's appearance will be waived for these scheduling conferences.

- Detained status hearings in cases previously set for non-jury trials and continued due to COVID-19 shall be set for a remote scheduling hearing through a Court order. At or following the scheduling hearing, upon request of both parties, a non-jury trial may be set a minimum of 30 days in advance.

- All other DVM and CCC hearings, including status hearings, diversion matters, trials, and sentencings, scheduled through November 9, 2020, will be continued consistent with a scheduling order issued by the presiding judge.

- Remote hearings in non-detained matters may be scheduled on Mondays, Wednesdays, or Fridays in either remote Courtroom 118 or 119 upon the request of the parties.

- Judges will have the ability to schedule hearings on a case-by-case basis, subject to capacity.

Civil Protection Order Cases (CPOs)

- Proceedings in the Domestic Violence Division are open to the public. Parties will receive instructions on how to join the courtroom directly. Non-parties should contact the DV Division Clerk's Office by calling (202) 879-0157 or emailing DVDhearings@dcsc.gov to obtain information to access a specific courtroom.

- To facilitate remote hearings, the Domestic Violence Division encourages all parties to contact the Clerk's Office at (202) 879-0157 to provide contact information, including any telephone numbers and email addresses where parties can be reached.  Please call this number to provide your contact information or that of any parties.

- Requests for Temporary Protection Orders will continue to be heard remotely.

- All existing TPO expiration dates shall be extended to the future date consistent with a scheduling order issued by the presiding judge.

11

- Parties will receive TPOs and other case-related paperwork (such as self-service packets) electronically, including through email correspondence.

- All existing CPOs expire either on the expiration date of the order or on June 19, 2020 whichever is the latter of the two dates, unless a Motion to Extend is filed.  Note that the expiration of existing CPO cases differs from the DV Division's approach in the previous COVID-19 Orders issued on March 19, 2020 and May 14, 2020, but is consistent with the Order issued on June 19, 2020.

- CPO hearings and related-CPO hearings will be continued to a future date consistent with a scheduling order issued by the presiding judge. Upon request of the parties, hearings, such as consent civil protection order cases facilitated through the attorney negotiation process, will be heard in the remote courtroom directed by the Court.  Judges will have the ability to schedule other hearings on a case-by-case basis, subject to capacity.

## Extreme Risk Protect Orders (ERPOs)

- Requests for Ex Parte and Final ERPOS are available and can be made by emailing the filing to DomesticViolenceManagement@dcsc.gov. The petition can be obtained from the DC Courts website. The assigned judge will hear the matter in a remote courtroom.

- All existing *Ex Parte* ERPO expiration dates shall be extended to the future date consistent with a scheduling order issued by the presiding judge.

- All existing ERPOs expire on the expiration date of the order, unless a Motion to Extend is filed.

**FAMILY COURT**

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing orders and other orders issued by the Court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court, except:
Abuse and Neglect Cases and Related Matters:

Motions practice and discovery in Neglect matters, Adoption matters, Termination of Parental Rights matters, and Guardianship matters shall continue to be governed by applicable Superior Court rules unless otherwise directed by the assigned judge. Adoptions and Safe Family Act (ASFA) deadlines shall remain in effect.

Adoption petitions may be filed electronically, via digital drop box at https://dcscgov.app.box.com/f/aeaf4eb2153743519a495d3f95d26c93.  All other pleadings in adoption matters may be filed remotely via E-Filing/CaseFileXpress.

Domestic Relations Cases:

Counsel and parties are expected to comply with applicable procedural rules including the filing of motions and oppositions unless otherwise directed by the assigned judge. All deadlines in orders issued on or after March 20, 2020 stand.  All deadlines in orders issued before March 20, 2020 are extended by 90 days.

Because individuals are likely unable to comply with social distancing and "diligent efforts" to serve (either personally or by going to the post office to obtain a certified mail), electronic service via text message or email is permissible in accordance with Rule 4(c)(3)(B) without further order of the Court.  The serving party must prove service to the satisfaction of the assigned judge, including showing that the electronic method of service was "reasonably calculated to give actual notice."  Parties cannot serve electronically under Rule 4(c)(3)(B) if personal service is required by statute,

13

including D.C. Code §§ 13-332 (requiring personal service on minors), 13-333 (requiring personal service on incompetent persons), and 46-206 (requiring personal service of the notice in cases involving support).

Mental Habilitation Cases:

Counsel for Respondents shall continue to file Updated Status Reports pursuant to Administrative Order No 00-06, and to the extent possible, shall file Respondents Reports on Informed Consent for Voluntary Commitment and Substitute Decision Maker Reports. Parties shall comply with any existing order to file a special report or specific document. Parties shall comply with any existing order (a) requiring participants to convene meetings or (b) requiring the Department of Disability Services to provide specific services or supports to the extent possible, in light of the pandemic.

The Family Court is conducting the following types of remote hearings:

Abuse and Neglect and Related Matters:

- Neglect initial hearings
- Emergency hearings
- Disposition hearings
- Stipulation Hearings
- Trials of any type, including *Ta. L.* Hearings, Adoptions, Termination of Parental Rights Motions, and Guardianship Trials, shall be scheduled as WebEx availability permits
- Family Treatment Court hearings
- Permanency Hearings, Review of Disposition Hearings, and Pretrial Hearings shall be scheduled as WebEx availability permits
- Other hearings as WebEx availability permits

14

Domestic Relations:

- Divorces, separations, custody, child support, contested or uncontested depending on courtroom availability and such other matters that the Court deems appropriate.
- Domestic relations same day emergency hearings.
- Emergency motions to modify custody or for contempt where same day emergency hearing was denied but the Court concludes that it is both necessary and feasible to hear the motion on an expedited basis.
- Discretionary matters, such as resolving discovery issues or other issues, either capable of resolution during a remote hearing, or deemed necessary in the interest of justice.

Juvenile Delinquency, Persons in Need of Supervision, and Private Adoptions:

All deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled, and extended during the period pending further order of the Court. Notwithstanding this Order, the Family Court will hold the following hearings:

- Juvenile initial hearings, including probable cause hearings.

- Any other hearings (e.g. emergency hearings, status hearings, disposition hearings) based upon the judge's determination that holding a hearing would be beneficial toward resolving the case or will result in a change in the level of detention of a juvenile; this applies to HOPE and Juvenile Behavioral Diversion Program (JPDP) courts.

- Factfinding hearings for juveniles, which will occur only remotely and only if the Court finds for specific reasons that the factfinding hearing in that case cannot be further delayed without serious harm to the interests of justice, and only with the consent of the respondent after consultation with counsel. Either party may seek a continuance of a

15

factfinding hearing for reasons of witness unavailability, or any other reason, in accordance with the Superior Court Juvenile Rules.

- Special Immigrant Juvenile Status hearings.

- Private adoptions, when possible.

## Mental Health:

- Mental health probable cause hearings.
- Mental Health Commission hearings.
- Revocation hearings, status hearings where needed, emergency hearings, pretrial hearings and trials where feasible and all parties can appear via WebEx.

## Mental Habilitation:

- Mental habilitation review and emergency hearings when all parties can access the court via WebEx.

## Name Changes:

- Uncontested requests, when known and contested requests deemed necessary in the interest of justice.
- Emergency requests.

## Parentage and Support Cases:

- All cases where needed and resolving those on paper where possible.

## Marriages:

- Marriages have resumed and are being conducted via WebEx. Parties who wish to apply for a marriage license, please visit:

16

https://www.dccourts.gov/form/marriage-application

## Other Relevant Information:

- The process for filing new domestic relations complaints or petitions in Family Court is laid out in detail on the Court's website, see: https://www.dccourts.gov/sites/default/files/DRB-Case-InitiationInstructions-for-filers.pdf.

- The Family Court Self-Help Center (202-879-0096) is operating on a remote basis to provide information and to assist parties in filing documents in Family Court cases (divorce, child custody, child support, etc.).

- The Court will issue summonses electronically and will email them to the filer.

- Domestic Relations Initial Hearings will not be scheduled at the time of filing; they will be scheduled once a responsive pleading is filed or an affidavit of service is filed and as is feasible given the status of Court operations.

- The Supervised Visitation Center is conducting intake interviews and supervised visits remotely.

- Multi-door mediation and intake for mediation is available for parties able to participate in remote mediation either through videoconferencing or telephonically.

## **PROBATE DIVISION**

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that

17

would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Probate Division will operate as follows:

- Judges will hear the following matters remotely by WebEx:

- 21-Day Emergency Guardians — Filed by email (attorneys and self-represented filers) and by Telephone (self-represented filers only)

- 90-Day Health-Care Guardians — Filed by email (attorneys and self-represented filers) and by Telephone (self-represented filers only)

- Petitions for General Proceedings (Guardianship and Conservatorship petitions) – Filed by email (attorneys and self-represented filers); and by mail (attorneys and self-represented filers)

- Other Intervention matters which the individual judge determines are appropriate to be heard remotely by WebEx

- Other Probate matters, including Estate cases, which the individual judge determines are appropriate to be heard remotely by WebEx

## TAX DIVISION

Unless otherwise ordered by the Court, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court that would otherwise expire are suspended, tolled and extended during the period pending further order of the Court.

The Tax Division will operate as follows:

- Show Cause hearings will be heard remotely via WebEX

18

- Initial Scheduling and Pre-Trial Conferences will be held remotely by WebEx

## OFFICE OF THE AUDITOR MASTER

All Auditor-Master hearings are currently **cancelled** and parties are not to appear.  All orders that have been issued directing parties to produce documents are continued.  The Office will issue separate orders that will reschedule all previously scheduled hearings, schedule hearings in new matters, and set new dates for production of documents.  Where possible hearings will be conducted remotely until the Court resumes onsite operations.

Be advised that staff is processing all documents remotely.  Documents may be submitted via email to: Auditor.Master@dcsc.gov or mailed to: D.C. Superior Court, Office of the Auditor-Master, 500 Indiana Avenue NW, Washington, DC 20001.

Reports are currently being prepared for matters in which all hearings have been conducted and all documentation has been received.  Reports will be served on parties when they are completed.

For questions, please contact the Office via telephone at 202-626-3280 or email at Auditor.Master@dcsc.gov.

**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Ibraheem Samirah

_____
Plaintiff

vs.

Case Number **2020 CA 002808 B**

District Smiles, PLLC

_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Leizer Z. Goldsmith

_____
Name of Plaintiff's Attorney

5335 Wisconsin Avenue, N.W., Suite 440

_____
Address
Washington, D.C. 20015

(202) 926-3535

_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date **06/17/2020**

如需翻譯,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오     የትርጉም እርዳታ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

Ibraheem Samirah
_____

Plaintiff

vs.

Case Number    **2020 CA 002808 B**

Nina Kimmel
_____

Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Leizer Z. Goldsmith
_____
Name of Plaintiff's Attorney

5335 Wisconsin Avenue, N.W., Suite 440
_____
Address
Washington, D.C. 20015

(202) 926- 3535
_____
Telephone

Clerk of the Court

By _____
                                    Deputy Clerk

Date    **06/17/2020**

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오.          ያማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Ibraheem Samirah

_____
                                        Plaintiff

                    vs.

                                        Case Number    **2020 CA 002808 B**

Maryam Seifi

_____
                                        Defendant

### SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Leizer Z. Goldsmith                                  _Clerk of the Court_
_____
Name of Plaintiff's Attorney

5335 Wisconsin Avenue, N.W., Suite 440
_____              By _____
Address                                                        Deputy Clerk
Washington, D.C. 20015
_____
(202) 926- 3535                                      Date    **06/17/2020**
_____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828   ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                        See reverse side for Spanish translation
                        Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                              Super. Ct. Civ. R. 4

**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Ibraheem Samirah

                                          Plaintiff

vs.

                                                    Case Number   **2020 CA 002808 B**

William Powell

                                          Defendant

### SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Leizer Z. Goldsmith

Name of Plaintiff's Attorney

5335 Wisconsin Avenue, N.W., Suite 440

Address
Washington, D.C. 20015

(202) 926- 3535

Telephone

*Clerk of the Court*

By

Deputy Clerk

Date :   **06/17/2020**

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면,(202)879-4828로 전화해주십시오    ያማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                    Super. Ct. Civ. R. 4